# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FURNITURE FACTORY ULTIMATE | ) |
| HOLDING, L.P., *et al.*,[1] | ) Case No. 20-12816 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF DONALD ROACH IN SUPPORT
## OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

I, Donald Roach, declare as follows:

1.      I am the Chief Operating Officer and Chief Financial Officer of each of the above-captioned debtors (each a "<u>Debtor</u>," and collectively, the "<u>Debtors</u>" or the "<u>Company</u>").  On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>").  I am familiar with the day-to-day operations, businesses, and financial affairs of the Debtors.

2.      I submit this declaration (the "<u>First Day Declaration</u>") to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these chapter 11 cases.  I also submit this First Day Declaration in support of the first day motions[2] and applications filed by the Debtors contemporaneously herewith, or as soon as reasonably practicable hereafter, by which the Debtors

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Furniture Factory Ultimate Holding, L.P. (4089); Furniture Factory Holding, LLC (5055); Furniture Factory Intermediate Holding, LLC (8060); Furniture Factory Outlet, LLC (3952); Furniture Factory Outlet Transportation, Inc. (7131); Bedding Holding, LLC (7744); Bedding Intermediate Holding, LLC (6384); Bedding, LLC (4774).  The Debtors' headquarters and mailing address is: 6500 Jenny Lind Road, Space A, Fort Smith, AR 72908.

[2]     All references to agreements, pleadings, or other documentation or summaries thereof in this First Day Declaration are qualified in their entirety by the terms set forth in the relevant agreements, pleadings, or other documents.

1

seek relief enabling the Debtors to continue as going concerns, operate effectively, minimize certain of the potential adverse effects of the commencement of their chapter 11 cases and the continued effects on its business caused by the Coronavirus Disease 2019 pandemic ("COVID-19"), and preserve and maximize the value of the Debtors' estates.  I submit this First Day Declaration based on my own personal knowledge, except as expressly provided, and as my testimony, if called to testify.

## **BACKGROUND**

**A.      The Company's Business**

3.      The Debtors are an everyday low-price provider of fashionable and affordable home furniture in South Central and Midwest United States, and were founded in 1984 in Muldrow, Oklahoma around an original concept of providing quality furniture at highly competitive prices with the Company's "lowest price every day" guarantee, a differentiator from the competition.  The Company offers products spanning every need for the home, including living room, dining room, and bedroom furniture, mattresses, home décor, and other accessories, and carries prominent furniture brands, including Serta, Jackson Catnapper, and United/Lane, as well as a range of products under its Natural elements brand.

4.      Prior to the governmental mandated COVID-19 shutdown, the Debtors operated 68 locations and employed approximately 675 employees. As a consequence of the required shutdowns and the concomitant massive reduction in revenue and available liquidity, the Debtors permanently closed 37 locations and terminated employees at those locations.  As of the Petition Date the Debtors are operating 31 retail locations across Arkansas, Missouri, Oklahoma, Kentucky, and Indiana, in addition to a bedding manufacturing facility and one distribution facility (the "Business") and the Debtors currently employ 270 employees.

5.      In fiscal year ending 2019 the Debtors had revenues of approximately $143 million.

**B.      Corporate and Capital Structure**

6.      The Debtors are portfolio companies of affiliates of Sun Capital Partners.  Furniture Factory Ultimate Holding, L.P. itself owns 100% of the interests in Furniture Factory Holding, LLC, which itself owns 100% of the interests in Furniture Factory Intermediate Holding, LLC, which itself owns 100% of the interests in Furniture Factory Outlet, LLC, which itself owns 100% of the interests in Furniture Factory Outlet Transportation, Inc.  Furniture Factory Ultimate Holding, LP also owns 100% of the interests in Bedding Holding, LLC, which itself owns 100% of the interests in Bedding Intermediate Holding, LLC, which itself owns 100% of the interests in Bedding, LLC.  A Corporate Organizational Chart is attached hereto as **Exhibit A**.

7.      As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $49.4 million, $22.0 million of which is outstanding under the 1L Pre-Petition Credit Agreement (defined below), $12.7 million of which is outstanding under the 2L Pre-Petition Credit Agreement (defined below) and $14.7  million of which is outstanding under certain unsecured grid notes, and unsecured trade debt of approximately $14.9 million, excluding lease termination and lease rejection claims.  I understand that the Debtors prepetition first lien obligations are secured by liens on substantially all of the Debtors' assets and proceeds thereof.

*I.      1L Prepetition Secured Credit Facility.*

8.      Pursuant to that certain Credit Agreement dated as of June 10, 2016 (as amended, restated, supplemented, or otherwise modified from time to time, the "1L Pre-Petition Credit Agreement"; together with the Loan Documents (as defined in the 1L Pre-Petition Credit Agreement) and any other agreements or documents executed or delivered in connection therewith,

each as amended, restated, supplemented, or otherwise modified from time to time, the "1L Pre-Petition Loan Documents") by and among (a) Furniture Factory Outlet, LLC (the "1L Borrower"), (b) Furniture Factory Intermediate Holding, LLC ("FFIH") and certain subsidiaries of the 1L Borrower from time to time party thereto (the "Subsidiary Guarantors"; together with the 1L Borrower and FFIH, the "1L Pre-Petition Obligors"), (c) Stellus Capital Investment Corporation (the "1L Pre-Petition Agent"), and (d) each of the Lenders (as defined therein) party thereto (in such capacity, the "Initial 1L Pre-Petition Lenders"; together with the 1L Pre-Petition Agent, collectively, the "1L Pre-Petition Secured Parties"), the Initial 1L Pre-Petition Lenders agreed to provide certain credit facilities and other financial accommodations to the 1L Borrower on the terms and conditions set forth more completely therein.

9.     As more fully set forth in the 1L Pre-Petition Loan Documents, the 1L Pre-Petition Obligors granted to the 1L Pre-Petition Agent, for the benefit of itself and the Initial 1L Pre-Petition Lenders, a first-priority security interest in and continuing lien on (the "1L Pre-Petition Liens") certain "Collateral" (as defined in the 1L Pre-Petition Credit Agreement), including all real and personal property, other than certain specified "Excluded Property" (as defined in the 1L Pre-Petition Credit Agreement) of the 1L Pre-Petition Obligors, as perfected against by the filing of (i) that certain UCC-1 financing statement file number 2016 3499389 naming Furniture Factory Outlet, LLC as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (ii) that certain UCC-1 financing statement file number 2019 0127154 naming Bedding, LLC as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (iii) that certain UCC-1 financing statement file number 2018 5701343 naming Furniture Factory Ultimate Holding, LP as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (iv) that certain

UCC-1 financing statement file number 2018 5701251 naming Furniture Factory Holding, LLC as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (v) that certain UCC-1 financing statement file number 2016 3499348 naming Furniture Factory Intermediate Holding, LLC as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (vi) that certain UCC-1 financing statement file number 2018 5700758 naming Bedding Holding, LLC as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (vii) that certain UCC-1 financing statement file number 2018 5700873 naming Bedding Intermediate Holding, LLC as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Delaware, (viii) that certain UCC-1 financing statement filing ID number 40000130240236 naming Furniture Factory Outlet Transportation, Inc. as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the State of Arkansas, (ix) that certain UCC-1 financing statement filing number 2018-2944843-05.01 naming Bedding, Inc. as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the Commonwealth of Kentucky and (x) that certain UCC-1 financing statement filing number 2018-2944846-38.01 naming Service Furniture Corporation as debtor and 1L Pre-Petition Agent as secured party filed with the Secretary of State of the Commonwealth of Kentucky  (collectively, as such, the "1L Pre-Petition Collateral").

10.     Pursuant to that certain Assignment and Assignment and Assumption Agreement (the "Assignment Agreement") by and between certain of the Initial 1L Pre-Petition Secured Parties and DIP Lender, the Initial 1L Pre-Petition Secured Parties sold and assigned all of their respective rights and interests under the 1L Pre-Petition Loan Documents to the DIP Lender (in its capacity as the holder of such rights and interests, the "Current 1L Prepetition Lender").

11.     As of the Petition Date, the 1L Pre-Petition Obligors were indebted to DIP Lender (as successor-in-interest to the Initial 1L Pre-Petition Secured Parties) on account of the obligations under the 1L Pre-Petition Credit Agreement in the aggregate principal amount of not less than $21,873,846.89  (together with accrued and accruing interest, fees, expenses and other charges, the "1L Pre-Petition Obligations").

## II.     Prepetition Intercreditor Agreement.

12.     Furniture Factory Note Holding, LLC, as agent (in such capacity, the "Subordinated Agent") on behalf of the Lenders (collectively, together with the Subordinated Agent, the "Subordinated Creditors") under the Second Lien Credit Agreement with the Debtors dated June 28, 2019 (as amended from time to time the "2L Pre-Petition Credit Agreement") executed a Subordination and Intercreditor Agreement dated June 28, 2019 in favor of the 1L Pre-Petition Agent (the "Intercreditor Agreement").

## C.     Events Leading Up to the Chapter 11 Cases

13.     The Company brought on new leadership in 2019 and began a series of strategic initiatives to revitalize the brand, business model, and sales strategy to reshape the business' long-term strategic direction.  The Debtors were experiencing initial success with their initiatives and were seeing operational improvements prior to the COVID-19 pandemic.

14.     In March of this year, the COVID-19 pandemic resulted in mandatory closure orders, which forced the Company to temporarily close its stores and its manufacturing facility for the duration of the orders.   These closures dropped the Company's revenue to nearly zero overnight, which led to the Company laying off approximately 95% of its total workforce.

15.     During the mandated closures, the Debtors addressed their lease obligations and attempted to negotiate more favorable terms with their landlords.  However, the continuing impacts

6

of the pandemic and the need to conserve cash ultimately required the Debtors to permanently exit a significant amount of their stores.

16.    As closure restrictions started to ease, the Debtors began reopening their stores in May of this year.  The re-opened stores operated on a 4-day week at first, which then progressed to a 5-day week.  The Debtors are now operating on a 7-day week as they did pre-pandemic.  The results from the re-openings have been generally in line with expectations on a significantly reduced store base.  Access to inventory on a consistent basis has been a limiting factor to consistent sales performance.

17.    In addition to the direct impact of the pandemic on the Debtors' business by way of closures, the Debtors' entire supply chain has faced challenges that have further pressured the business.  Raw materials have been harder to acquire, which has impacted manufacturers' ability to produce goods.  The pandemic has also impacted manufacturing safety which has lessened the amount of finished goods available.  Furthermore, transportation of raw materials and finished goods has been additionally pressured as a result of restrictions on the labor force.  As a result, the Debtors' revenue continues to be choked by the lessened inventory supply chain.

18.    In addition to the COVID impacts, the Debtors are also suffering weather related shortages of raw materials for their mattress manufacturing business.  Recent storms have affected the Gulf region which has impacted both soy-based foam and petroleum-based foam availability.  As a result, the Debtors' revenue has been further constrained by their inability to meet demand due to raw material shortages.

19.    Although the Debtors' business is generally performing in line with expectations for its reduced size, the reduction in the total size of the enterprise, along with the cash pressures

as a result of the time the Debtors' stores were closed, caused the Debtors to explore restructuring alternatives.

20.     During the months prior to the Petition Date, the Debtors determined that a sale of substantially all of their assets (*i.e.*, the Business) as a going concern would maximize the value of the Debtors' estates for the benefit of their creditors and other stakeholders.  To that end, in June 2020, the Debtors engaged FocalPoint Securities, LLC ("FocalPoint") as their proposed investment banker to locate investors and to assist in the evaluation of strategic alternatives, including the sale of the Debtors or their assets.   The Debtors tasked FocalPoint with marketing their assets for sale as a going concern.  FocalPoint prepared marketing materials intended for distribution to prospective buyers of the Debtors' assets including a teaser, confidential investment memorandum, and the aggregation of key company documents located in an online data room for further diligence.

14.     In addition, FocalPoint worked with the Debtors to develop a list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

15.     As of the Petition Date, FocalPoint contacted approximately 121 potential strategic and financial buyers, out of which 24 executed confidentiality agreements and received the confidential information memorandum and requested diligence information and 3 parties participated in management meetings and had access to the full online data room.  The Debtors received initial indications interest from each of the 3 that participated in management presentations.

16.     In addition, the Debtors commenced negotiations with American Freight FFO, LLC to serve as a "stalking horse" purchaser for the proposed sale.  As a product of these negotiations, the Debtors and American Freight FFO, LLC entered into that certain *Asset Purchase Agreement*

dated November 4, 2020 (the "Stalking Horse Agreement"), by and among the Debtors as sellers and American Freight FFO, LLC as buyer (the "Stalking Horse Purchaser").  A true and correct copy of the Stalking Horse Agreement is attached hereto as Exhibit B.

17.     In the interim, however, the Debtors continued to suffer a drain on cash flow and lacked a source of long-term additional liquidity.  Due to the Debtors' cash position and lack of realistic, viable alternatives, it became apparent that the most effective way to maximize the value of the Debtors' estates for the benefit of their stakeholders was to continue the sale process through chapter 11.

**D.     Goals of the Chapter 11 Cases**

18.     The Company commenced these chapter 11 cases to preserve value for its stakeholders, including its employees and creditors.  Additionally, the Debtors have negotiated a debtor-in-possession financing facility that will allow the Debtors to continue to operate in the normal course, pay landlords and vendors, and have sufficient liquidity to pay the administrative costs, both operational and statutory, required in these chapter 11 cases.

19.     FocalPoint will continue to market the Debtors' assets for sale to potential purchasers other than the Stalking Horse Purchaser, with the Stalking Horse Purchaser serving as a bidding floor.

20.     Contemporaneously with the filing of these chapter 11 cases, the Debtors filed their sale procedures motion and sale motion with the Court to approve the asset purchase agreement with American Freight FFO, LLC to serve as the stalking horse purchaser, establish a formal sale

timeline, which will include an auction process, with a goal of exposing the existing asset purchase agreement to higher and better offers.

21.     The proposed sale timeline is as follows:

| | |
|---|---|
| Cure/Assignment Objection Deadline | December 10, 2020 at 4:00 p.m. prevailing Eastern time |
| Bid Deadline | December 14, 2020 at 4:00 p.m. prevailing Eastern time |
| Stalking Horse Adequate Assurance Objection Deadline | December 10, 2020 at 4:00 p.m. prevailing Eastern time |
| Auction | December 15, 2020 at 10:00 a.m. prevailing Eastern time |
| Sale Objection Deadline | December 10, 2020 at 4:00 p.m. prevailing Eastern time |
| Non-Stalking Horse Adequate Assurance Objection Deadline | December 16, 2020 at 4:00 p.m. prevailing Eastern time |
| Sale Hearing | December 17, 2020 at [•] [•]. m. prevailing Eastern time |

22.     The proposed sale timeline is necessary in order to allow the transaction to close prior to the end of the year.  As discussed above, the Debtors' industry is experiencing significant supply chain shortages and disruption.  The Debtors' industry experiences a surge of demand towards the middle to end of the first quarter of the year, which coincides with anticipated and paid tax refunds.  In order to secure inventory to meet such demand, the Debtors will be required to expend significant funds in advance for delivery of inventory.   Furthermore, vendors may be less inclined to schedule production and shipment for the Debtors, and instead schedule production and shipment for their competitors, if the Debtors do not have certainty with respect to their new ownership.  Moreover, any new owner, whether the Stalking Horse Purchaser or another successful bidder, will want input into the mix and quantity of inventory that is purchased.  Although the DIP Lender and Stalking Horse is willing to fund the process to get to a transaction, they are unwilling to fund the significantly increased expenditures that would be needed to build up the inventory for

10

the peak season.  As a result, the proposed sale timeline is necessary to maximize the value of the Debtors' estates.

23.     The Debtors believe that a marketing sale process through these chapter 11 cases is in the best interest of the Company's creditors and will maximize the value of these estates.

### Evidentiary Support for First Day Motions

24.     Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to avoid irreparable harm and to enable them to efficiently administer their estates and continue to operate with minimal disruption and loss of value during these chapter 11 cases and to ensure the best outcome for the Debtors, their estates, and their creditors (collectively, the "First Day Pleadings").

25.     I have reviewed each of the First Day Pleadings listed on **Exhibit B** attached hereto, and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.


Dated: November 5, 2020          */s/ Donald V. Roach*
                                 By: Donald V. Roach
                                 Title:  Chief Operating Officer & Chief Financial Officer

11

## EXHIBIT A

**Corporate Organizational Chart**

PHIL1 9181366v.3

# FFO Structure Chart



**EXHIBIT B**

**First Day Pleadings**[3]

---

[3]    Capitalized terms not defined hereafter shall have the same meanings ascribed to them as in the respective First Day Pleadings.

13

**EXHIBIT B**

**Evidentiary Support for First Day Motions**[1]

I.   **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of their related chapter 11 cases and granting any related relief. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases.  Accordingly,  I respectfully  submit that the Joint Administration  Motion  should be approved.

II.   **Debtors' Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, and (III) Granting Related Relief  (the "Creditor Matrix Motion").**

---

[1]     Capitalized terms not defined hereafter shall have the same meanings ascribed to such terms in the respective First Day Motion.

3.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file (i) a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (ii) a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor; (b) authorizing the Debtors to redact certain personal identification information; and (c) granting related relief.

4.      It is my understanding, through discussions with the Debtors' advisors, that the preparation of separate lists of creditors for each debtor would be expensive and time consuming. To alleviate this issue, the Debtors have requested to file a consolidated creditor matrix. Because the top creditors of the Debtors overlap, and certain Debtors may have fewer than thirty significant unsecured creditors, the Debtors submit that filing separate lists for each Debtor would be of limited utility. In addition, the exercise of compiling separate lists for each individual Debtor could consume an excessive amount of the company's limited time and resources. Further, the Debtors believe that a single, consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will better aid the U.S. Trustee in its efforts to communicate with these creditors.

5.      Additionally, it is my belief that, through discussions with the Debtors' advisors, that the list of creditors may include personally identifiable information, which could be used to perpetrate identity theft if disclosed publicly. To prevent any harm to creditors as a result of identity theft and to avoid disclosure of otherwise private information, the Debtors request sealing of personally identifiable information in any paper filed or to be filed with the Bankruptcy Court in these chapter 11 cases, including the creditor matrix.

The Debtors have made and will continue to make reasonable, good faith efforts to determine appropriate notice addresses for creditors. However, despite such diligence, the Debtors may not

be able to identify notice addresses for all creditors. Accordingly, the Debtors request limiting the notices required under Bankruptcy Rule 2002 to those creditors for which the Debtors are able to determine notice addresses after expending reasonable, good faith efforts would be appropriate.

### III.    Debtors' Application for Appointment of Stretto as Claims and Noticing Agent (the "Claims and Noticing Agent Retention Application").

6.      Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order appointing Stretto ("Stretto")[2] as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases and granting related relief.

7.      Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.   Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Stretto's rates are competitive and comparable to the rates charged by their competitors for similar services.

8.      The Debtors anticipate that there will be thousands of parties and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I

---

[2]         Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

respectfully submit that the Court should approve the Claims and Noticing Agent Retention Application.

IV.  **Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, a n d (C) Maintain Existing Business Forms, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

9.  Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain prepetition obligations related thereto; and (iii) maintain existing Business Forms in the ordinary course of business and granting any related relief.

10.  The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting. The Debtors maintain daily oversight over the Cash Management System and implement cash management controls for entering, processing, and releasing funds. Additionally, the Debtors' corporate accounting and cash forecasting personnel regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

11.  Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**V.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

12.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, payroll services, federal and state withholding taxes and other amounts withheld plus reimbursable employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto. The Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits:

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Employee Compensation, Gross Wages and Tips | $190,000 | $190,000 |
| Withholding Obligations | $15,000 | $15,000 |
| Payroll Processing Fees | $5,000 | $30,000 |
| Reimbursable Expenses | $100,000 | $5,000 |
| Employee Benefits Programs | $215,000 | $215,000 |
| **Total** | **$430,000** | **$430,000** |

13.     As of the Petition Date, the Debtors employ approximately 272 employees with approximately 85 full-time salaried employees, 81 hourly employees, and 106 commissioned employees (collectively, the "Employees").   Of these employees, approximately 211 are employees at store locations and the remainder is spread between management, manufacturing, distribution, store support center, and drivers.   None of the Employees are unionized.   The Employees perform a variety of functions critical to the preservation of value and the

administration of the Debtors' estates. In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maximize the value of their estates will be materially impaired.

14.     Additionally, many of the Employees rely on their compensation and benefits to pay their daily living expenses. Thus, the Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying the Employees' compensation and providing the Employees with health and other benefits. Consequently, I believe the relief requested is necessary and appropriate.

15.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld, reimbursable expenses, health insurance, life insurance, workers' compensation benefits, short- and long-term disability coverage, auxiliary benefits, retirement plans, paid time off, severance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

16.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and absent the payment of the Employee Compensation Benefits owed to the Employees, the Debtors will likely experience Employee turnover and instability at this critical time. I believe that without these payments, the Employees may become demoralized and unproductive because of the potentially significant financial strain and other hardships the Employees may face. Employees may then elect to seek alternative employment opportunities. I

believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

17.    Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

## VI.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").

18.    The Debtors have historically provided coupons, discounts and other accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize the value of the estates for the benefit of all of the Debtors' stakeholders.

19.    Importantly, I understand that the Debtors estimate that their prepetition obligations under the Customer Programs typically do not require the entail the expenditure of cash.

20.    The Debtors seek authorization, but not direction, to maintain their Customer Programs, including, but not limited to, Coupons, Sales Promotions, Layaway Program, Gift Certificates, and Return and Exchange Programs in the ordinary course of business.  Notably, the Debtors do not advertise or actively market gift certificates and provide them only upon request as an accommodation to customers.  The gift certificate is tied to a specific entry with respect to the

customer in the Debtors' accounting system, similar to a deposit, and is not tied to a physical card that could change hands.

21.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition or honor their existing obligations thereunder, the Debtors risk alienating certain customers (who might then decide to patronize the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for maximizing the value of their estates.  The Debtors' Customer Programs are also essential marketing strategies for attracting new customers.

22.     I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors' hard-earned reputation, which, in turn, could adversely impact the prospects for a successful sale process in these chapter 11 cases.

23.     I believe that the relief requested herein will benefit the Debtors' estates and the sale process, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**VII.    Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to Pay Certain Prepetition Claims of Shippers, Import**

**Claimants, Critical Vendors, and 503(b)(9) Claimants and Granting Related Relief (the "Vendor Motion").**

24.     Pursuant to the Vendor Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay certain Shipper Charges, Import Charges, Critical Vendor Claims, and 503(b)(9) Claims in an amount not to exceed $550,000  pursuant to the Interim Order; provided that no more than $270,000 may be expended with respect to Critical Vendor Claims and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed $750,000 pursuant to the Final Order; provided that no more than $455,000 may be expended with respect to Critical Vendor Claims, in each case absent further order of the Court; and (b) granting related relief.

25.     The Debtors interact with numerous different vendors.  A number of these vendors possess claims that are entitled to certain priorities under Bankruptcy Code section 503(b)(9) or may be entitled to possessory liens for a statutory trust or goods in transit to the Debtors. Additionally, a number of these vendors may be vendors that are essential to the Debtors' operations and cannot be replaced.  Furthermore, due to the nature of the Debtors' business that requires frequent deliveries and quick turnover of goods sold, creditors affected by this Motion may likely fall into more than one of the foregoing categories.

26.     The Debtors proposed to undergo a stringent analysis with their advisors, to determine which vendors fall into these categories and the extent to which each vendor is critical to the ongoing operations of the Debtors' businesses.  The Debtors proposed to undertake a reconciliation of such claims, and in their discretion and in accordance with their business judgement, determine which of these claims, if any, should be currently satisfied and whether or not the payment of such claims should be contingent on the extension of favorable business terms.

27.     Recognizing that payment of prepetition claims of certain vendors is extraordinary relief, the Debtors, with the assistance of myself and the Debtors' advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' businesses—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and impair going-concern viability. The Debtors submit that the requested relief will allow the Debtors to continue to operate and preserve the value of their estates by paying certain prepetition claims of certain vendors that are critical to the Debtors' business enterprise.

28.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Vendor Motion.

**VIII.    Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (VI) Granting Related Relief (the "Utilities Motion").**

29.     In connection with the operation of their businesses and management of their properties, the Debtors obtain water, sewer service, electricity, waste disposal, natural gas, telephone, cable/internet, and other similar services either directly from utility companies or their brokers or indirectly from landlords that pay for and pass through the costs associated therewith to the Debtors in accordance with the applicable nonresidential real property lease. The relief requested herein applies to all Utility Providers.

30.     The Debtors pay approximately $90,000 per month on average over the prior twelve-month period for utilities. The Debtors propose depositing $42,371 into a segregated

account as additional assurance of payment, which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.

31.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

32.     Any disruption in the Debtors' businesses would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  This, in turn, jeopardizes the value of the Debtors' estates and impacts creditor recoveries.  Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

## IX.    Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").

33.     The Debtors request entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to negotiate, remit and pay certain accrued and outstanding prepetition obligations accrued in the ordinary course of business on account of the Taxes and Fees in an aggregate amount not to exceed $500,000 on an interim basis  and  $700,000 on  a  final basis, absent further order of the Court; and to continue negotiating and paying the Taxes and Fees accrued in the ordinary course of business on a postpetition basis.

34.     The Debtors collect, incur, and pay sales and use taxes, annual report and licensing fees, personal property taxes, franchise taxes and fees, income taxes, and various other governmental taxes, fees, and assessments.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing authorities.  Taxes and Fees are remitted

and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions.  The Debtors estimate that approximately $661,000 in Taxes and Fees relating to the prepetition period are or will become due and owing to the Governmental Authorities after the Petition Date in the ordinary course.[3]  The Debtors further estimate that approximately $455,000 in Taxes and Fees relating to the prepetition period are or will become due and owing to the Governmental Authorities within 30 days after the Petition Date.

35.     The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the Governmental Authorities could file liens or seek to lift the automatic stay.

36.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**X.     Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Honor the Terms of the Financing Agreements and Pay Premiums Thereunder, and (II) Granting Related Relief (the "Insurance Motion").**

37.     The Debtors request authority authorizing but not directing them to pay obligations under insurance policies entered into prepetition and to renew, supplement, modify, or purchase insurance coverage in the ordinary course and honor the terms of certain financing agreements.  In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days

---

[3]      This estimate does not include any potential prepetition tax liability that may later come due as the result of an audit.

of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

38.     The Debtors maintain approximately ten (10) insurance policies administered by multiple third-party insurance carriers.  The Insurance Policies provide coverage for, among other things, general liability, automobile, workers' compensation, umbrella coverage, flood, property, D&O, and network/cyber liability.  The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.

39.     For the twelve months preceding the Petition Date, the Debtors paid approximately $850,000 in the aggregate on account of premiums under the existing Insurance Policies.  The Debtors generally pay premiums with respect to the Insurance Policies, as a combination of down payment and monthly payment, to the Debtors' insurance brokers.

40.     Certain of the Insurance Policies are financed through premium Financing Agreements with IPFS and AON Premium Financing.  Pursuant to the Financing Agreements, the Debtors are required to make monthly premium payments for the various policies.  As of the Petition Date, there is approximately $80,000 outstanding on account of the Financing Agreements and an additional $150,000 due on account of other insurance obligations, some or all of which will come due during the pendency of these chapter 11 cases.  The Debtors further estimate that approximately $70,000 of such amounts will come due within the first 30 days of these cases.  The Debtors seek the authority to honor any prepetition amounts outstanding on account of the Insurance Policies, including under the terms of the Financing Agreements, and pay premiums thereunder.

41.    Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreements, could have a significant negative impact on the Debtors' operations.  Continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' properties and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirements of the Office of the United States Trustee for the District of Delaware.

42.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**XI.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "<u>DIP Motion</u>").**

43.    The Debtors have an immediate need for access to incremental liquidity in the form of postpetition financing as well as access to Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will use cash to, among other things, continue operating their businesses and satisfy other working capital needs during these chapter 11 cases.  The Debtors believe that all or substantially all of their available cash constitutes the cash collateral, as that term is used by section 363(c) of the Bankruptcy Code, of the Prepetition Secured Parties.  The Debtors will therefore be unable to proceed with operating their businesses without the ability to use Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In

short, the Debtors' ability to finance their business operations, and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral, is vital to the preservation and maintenance of the value of the Debtors' estates and the successful prosecution of these chapter 11 cases.

44.    Further support for the DIP Motion can be found in the First Day Declaration and the Declaration of Michael Fixler in Support of the DIP Motion filed contemporaneously herewith. The DIP Motion seeks authority for the Debtors to obtain a DIP Facility with up to $6,540,000 in new money, including $1,750,000 during the interim period and an additional $4,790,000 upon entry of the Final Order (the "DIP Facility" and the loans made thereunder, the "DIP Loans") on the terms and conditions set forth in the DIP Orders and the DIP Credit Agreement to be executed among (i) Holdings, as borrower (ii) its subsidiaries and affiliates, as guarantors (collectively, the "Guarantors") and (iii) American Freight FFO, LLC, as lender (the "DIP Lender"). Without access to postpetition financing, I believe the Debtors would lack sufficient funds to meet their working capital needs and operate their business during these chapter 11 cases, including payment of employees and vendors, resulting in significant impairment of the value of the Debtors' estates to the detriment of all stakeholders.

45.    In light of the Debtors' liquidity position, I have assisted the Debtors in an evaluation of the Debtors' financing needs and funding alternatives and have worked closely with the Debtors, their management, and their advisors to evaluate the Debtors' cash requirements for their businesses. As part of their evaluation of the Debtors' financing needs, I worked with the Debtors in developing a cash flow forecast, which took into account anticipated cash receipts and disbursements during the projected period and considered a number of factors, including the effect of the chapter 11 filing on the operations of the business, likely fees and interest expenses

associated with any debtor-in-possession financing facility, professional fees, and required operational payments.  Given the Debtors' circumstances and for the reasons set forth below, I believe that the terms of the DIP Facility, as set forth in the DIP Agreements, are fair, reasonable, and adequate.

46.    Based on the foregoing, it is my belief that the DIP Facility and consensual use of Cash Collateral represents the best option available to address the Debtors' immediate liquidity needs and is a critical component of the Debtors' chapter 11 strategy.  It is also my belief that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances and were the product of extensive good-faith, arm's-length negotiations with the DIP Lenders.  Specifically, the Debtors determined that the milestones and covenants contained in the DIP Credit Agreement were negotiated and required by the DIP Lender as a condition to the DIP Facility.  Under the circumstances of these chapter 11 cases, these provisions are reasonable and appropriate.

47.    Finally, the Debtors' businesses are cash intensive, with significant recurring costs required to satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their businesses, preserve value, and to avoid irreparable harm pending the Final Hearing.  Absent funds available from the DIP Facility and access to Cash Collateral at this critical early stage, the Debtors could face a value-destructive interruption to their businesses—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.

48.    The Debtors seek further authorization to use the proceeds of the DIP Facility as expressly provided in the DIP Documents and consistent with the Budget to pay costs, fees, and

expenses of the DIP Lender and related attorneys' fees; to provide working capital for other general corporate purposes of the Debtors; and to pay administration costs, fees and expenses of these Cases and claims or amounts approved by the Bankruptcy Court.  As set forth in the DIP Motion, the Debtors also seek authorization to execute and deliver the DIP Credit Agreement and related documents and to perform such other and further acts as may be necessary or appropriate in connection therewith.

49.    In exchange for the DIP Loans, the DIP Lender will receive a superpriority allowed administrative expense claim status in the chapter 11 cases and a postpetition  security interests in and liens on all property and assets of the Debtors, of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located; all property of the estate of the Debtors within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law, subject to entry of the Final Order); and all proceeds, rents and products of the foregoing, with the exception of certain assets as expressly provided in the DIP Credit Facility, subject to certain excluded assets and carve outs.

50.    The DIP Motion, if granted, provides authority for the Debtors to use, among other things, in accordance with the Budget, any cash collateral in which the DIP Lender may have an interest and the granting of adequate protection to the DIP Lender with respect to any diminution in value of their interests in the Prepetition Collateral arising from, inter alia, the Debtors' use of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay under section 362 of the Bankruptcy Code.

51.     The Debtors, therefore, request immediate authority to obtain postpetition financing and use Cash Collateral on an interim basis, as set forth in this Motion and in the Interim Order, to prevent immediate and irreparable harm to their estates pending the Final Hearing.