# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| FURNITURE FACTORY ULTIMATE HOLDING, L.P., *et al.*,[1] | ) Case No. 20-12816 (___) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |

## DECLARATION OF MICHAEL FIXLER IN SUPPORT OF DIP MOTION

I, Michael Fixler, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I submit this Declaration (the "<u>Declaration</u>") in support of the *Debtors' Motion for Entry of an Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503, and 507 and FED. R. BANKR. P. 2002, 4001, 6004, and 9014: (I) Authorizing the Debtors to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* (the "<u>DIP Motion</u>"),[2] which seeks approval, among other things, of a $6,540,000 million superpriority senior secured priming loan facility and the postpetition use of Cash Collateral.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Furniture Factory Ultimate Holding, LP (4089); Furniture Factory Holding, LLC (5055); Furniture Factory Intermediate Holding, LLC (8060); Furniture Factory Outlet, LLC (3952); Furniture Factory Outlet Transportation, Inc. (7131); Bedding Holding, LLC (7744); Bedding Intermediate Holding, LLC (6384); and Bedding, LLC (4774).  The Debtors' headquarters and mailing address is: 6500 Jenny Lind Road, Space A, Fort Smith, AR 72908.

[2] Capitalized terms used but not defined herein shall have the meaning given to such terms in the DIP Motion, which also summarizes the material terms of the proposed DIP Facility and the use of Cash Collateral.

2. I am over the age 18 and am authorized to submit this Declaration on the Debtors' behalf, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3. I am a Managing Director of the investment banking firm FocalPoint Partners, LLC ("FocalPoint"), a financial advisory and investment banking firm. I am authorized to make this declaration on behalf of FocalPoint.

4. I have experience in a wide range of corporate finance transactions, including restructurings and reorganizations, mergers and acquisitions, debt and equity financings, joint ventures, opinions to Board of Directors and other matters. I have advised numerous clients through investment banking and restructuring processes across a range of industries – clients include LifeCare, Holdings, Inc., Claire's, True Temper Sports, Canwest LP, International Garden Products, Elipda Memory, Inc., Takefuji Corp., Southwest Airlines Pilots Association, Regatta USA LLC, Instinet Group, Yankee Group, Tower Group, American Express Business Finance, Reuters, amongst others.

5. FocalPoint is a leading, independent middle market investment bank with approximately 50 professionals in Chicago, Los Angeles, New York, and Shanghai. FocalPoint's special situations professionals have significant experience in the industrials sector, and specifically with respect to advising capital equipment manufacturers as well as a variety of service and maintenance companies.

6. For more than 20 years, I have advised companies and their stakeholders in a variety of transactions related to mergers and acquisitions, capital raising and special situations, including bankruptcy cases. These clients included both public and private companies, institutional investors, statutory committees, and special situation buyers/investors.

7. Prior to joining FocalPoint, I was a managing director at Variant Capital Advisors and a partner at Candlewood Partners. Prior to my career in corporate finance, I practiced corporate and securities law in private practice and then joined one of my clients as general counsel and also led the company's corporate development efforts, ultimately resulting in the sale of the company to a strategic buyer.

8. I have assisted and advised debtors, creditors' committees, and other constituencies in numerous chapter 11 proceedings, including: *HDR Holding, Inc.* (Bankr. D. Del.); *Loot Crate, Inc.* (Bankr. D. Del.); *Apex Linen Services LLC* (Bankr. D. Del.); *Omni Facility Services* (Bankr. S.D.N.Y.); *Chart Industries, Inc.* (Bankr. D. Del.); *Delphi Corporation* (Bankr. S.D.N.Y.); *Pull'R Holdings, LLC* (Bankr. C.D. Cal.); *Gas City, Ltd.* (Bankr. N.D. Ill.); *Michael's Market, Inc.* (Bankr. N.D. Ill.); *Natural Pork Production II, LP* (Bankr. S.D. Iowa); *Constar International Holdings, LLC* (Bankr.); *Valuepart, Inc.* (Bankr. N.D. Tex.) and *Chellino Crane, Inc.* (Bankr. N.D. Ill.).

9. I received my Juris Doctor from Case Western Reserve University and Bachelor of Business Administration from the University of Miami.

10. The Debtors engaged FocalPoint as their investment banker in June, 2020 to assist in the evaluation of strategic alternatives, including a sale of the Debtors as a going concern. I have worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts. As a result, I have become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

11. The Debtors commenced these chapter 11 cases on November 5, 2020 (the "Petition Date"). Further facts relating to the Debtors, their background, capital structure, and the circumstances relating to the Debtors' chapter 11 cases are set forth in the *Declaration of Don*

*Roach in Support of First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously herewith.

12. As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $49.4 million, $22.0 million of which is outstanding under the 1L Pre-Petition Credit Agreement (defined in the DIP Motion), $12.7 million of which is outstanding under the 2L Pre-Petition Credit Agreement (defined in the DIP Motion) and $14.7 million of which is outstanding under certain unsecured grid notes, unsecured trade debt of approximately $14.9 million, excluding lease termination claims. I understand that the Debtors prepetition first lien obligations are secured by liens on substantially all of the Debtors' assets and proceeds thereof.

13. As detailed in the First Day Declaration, prior to the governmental mandated COVID-19 shutdown, the Debtors operated 68 locations. As a consequence of the required shutdowns and the concomitant massive reduction in revenue and available liquidity, the Debtors permanently closed 37 locations. As of the Petition Date the Debtors are operating 31 locations and their bedding manufacturing facility (the "Business"). The Debtors are offering for sale substantially all of their assets associated with the operation of their Business.

14. Leading up to the Petition Date, the Debtors and the DIP Agent engaged in arm's-length negotiations over the terms of the DIP Facility, as well as the terms of the proposed sale transaction. As negotiations between the Debtors and the DIP Agent progressed, FocalPoint, at the direction of the Debtors, made calls to five potential lenders (including specialty lenders and those that routinely provide debtor-in-possession financing) and a strategic interested purchaser to gauge their interest in providing postpetition financing on an unsecured basis, on a junior priority basis, or on a priming basis on more favorable economic terms than the proposed DIP Facility.

No potential lender would provide a proposal on an unsecured basis or on a junior priority basis. Several of these potential lenders stated that even if they were to make a financing proposal at all, it would require priming of the existing secured parties. Furthermore, the DIP Lender made it known that it would not consent to a priming loan from a third-party. In my experience, any such attempt by the Debtors would likely result in expensive and distracting litigation at the outset of these chapter 11 cases.

15. Further, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including timing and due diligence constraints, necessarily involving the payment of additional professional fees. In contrast, the proposed consensual DIP Facility and access to Cash Collateral offered by the DIP Lender allows the Debtors to avoid such risks at the outset of these chapter 11 cases.

16. Based on the foregoing, the Debtors believe, and I agree, that the DIP Facility and consensual use of Cash Collateral represents the best financing option available under the circumstances. It is also my belief that the economic terms of the DIP Facility are customary for debtor-in-possession financings of this type and were the product of arm's-length negotiations with the DIP Secured Parties.

17. The DIP Facility and access to Cash Collateral will provide the Debtors with immediate access to liquidity. The Debtors believe that obtaining access to the financing under the DIP Facility and Cash Collateral with the support of all of the holders of the Debtors' funded debt will send a positive signal to the Debtors' employees, vendors, suppliers, and customers that the Debtors will be able to continue to meet their commitments and are not likely to languish in bankruptcy, which the Debtors believe will facilitate the success of these chapter 11 cases.

18. The Debtors have filed the DIP Motion, which requests that the Court approve the DIP Facility provided by the DIP Lender as well as the use of Cash Collateral. As noted above and outlined in the First Day Declaration, absent debtor-in-possession financing, the Debtors lack sufficient liquidity to continue to operate their businesses while in chapter 11 and to continue to market their assets to effectuate a section 363 sale. The Debtors therefore need the relief requested in the DIP Motion, including access to the DIP Facility and use of Cash Collateral, in order to: (a) continue their ordinary course, day-to-day operations, including satisfying payroll obligations; (b) meet their ongoing obligations under their major trade agreements; (c) satisfy the administrative expenses of their chapter 11 cases; and (d) continue to market their business for sale as a going concern.

19. Based on the facts set forth above, I agree with the Debtors' conclusion that the proposed DIP Facility is the only viable option available for the Debtors to obtain postpetition financing. The Debtors are unable to obtain alternative debtor-in-possession financing on an unsecured basis or on a superpriority basis on economic terms more favorable than the proposed DIP Facility. In addition, I believe that financing secured by liens on the Debtors unencumbered assets (which I understand are virtually nonexistent) or junior liens on their encumbered assets is similarly unattainable.

20. Further, it is my view, based on my experience advising similarly situated companies, that the terms of the proposed DIP Facility are customary for this type of financing.

21. In sum, based on the foregoing, I believe, based on my experience advising similarly situated companies, that (a) no alternative debtor-in-possession financing is available to the Debtors on economic terms more favorable than those of the proposed DIP Facility, (b) the terms of the proposed DIP Facility are customary for this type of financing, and (c) access to the

DIP Facility and the consensual use of Cash Collateral is necessary for the Debtors to continue to operate their business during these chapter 11 cases and to fund chapter 11 administrative expenses.

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 5, 2020

/s/ *Michael Fixler*
Name:  Michael Fixler
Title:  Managing Director