# **EXHIBIT B**

**Asset Purchase Agreement**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**by and among**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.,**

**THE SELLER SUBSIDIARIES SET FORTH ON SCHEDULE I ATTACHED HERETO,**

**and**

**AMERICAN FREIGHT FFO, LLC**

**November 4, 2020**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................... 2

ARTICLE II PURCHASE AND SALE ............................................................. 12

| | | |
|---|---|---|
| **Section 2.1** | **Purchase and Sale of Purchased Assets** | **12** |
| **Section 2.2** | **Excluded Assets** | **14** |
| **Section 2.3** | **Assumption of Assumed Liabilities** | **15** |
| **Section 2.4** | **Excluded Liabilities** | **16** |
| **Section 2.5** | **Consideration** | **17** |
| **Section 2.6** | **Assumption and Assignment of Contracts.** | **17** |
| **Section 2.7** | **Closing.** | **19** |
| **Section 2.8** | **Deliveries at Closing.** | **19** |
| **Section 2.9** | **Allocation** | **20** |

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ................ 20

| | | |
|---|---|---|
| **Section 3.1** | **Organization of Sellers; Good Standing.** | **20** |
| **Section 3.2** | **Authorization of Transaction** | **21** |
| **Section 3.3** | **Noncontravention; Consents and Approvals** | **21** |
| **Section 3.4** | **Compliance with Laws** | **22** |
| **Section 3.5** | **Title to Purchased Assets** | **22** |
| **Section 3.6** | **Contracts** | **22** |
| **Section 3.7** | **Intellectual Property.** | **23** |
| **Section 3.8** | **Litigation.** | **23** |
| **Section 3.9** | **Employees and Employment Matters** | **23** |
| **Section 3.10** | **Employee Benefit Plans.** | **24** |
| **Section 3.11** | **Real Property.** | **25** |
| **Section 3.12** | **Permits** | **25** |
| **Section 3.13** | **[Intentionally deleted]** | **26** |
| **Section 3.14** | **Taxes** | **26** |
| **Section 3.15** | **Environmental Matters** | **26** |
| **Section 3.16** | **[Intentionally deleted]** | **26** |
| **Section 3.17** | **[Intentionally deleted]** | **26** |
| **Section 3.18** | **Insurance** | **26** |
| **Section 3.19** | **Product Warranties; Product Liability.** | **26** |
| **Section 3.20** | **Privacy Policy** | **27** |
| **Section 3.21** | **Certain Payments; OFAC** | **27** |
| **Section 3.22** | **Brokers' Fees** | **28** |
| **Section 3.23** | **No Other Representations or Warranties** | **28** |

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ................. 29

| | | |
|---|---|---|
| **Section 4.1** | **Organization of Buyer** | **29** |
| **Section 4.2** | **Authorization of Transaction** | **29** |
| **Section 4.3** | **Noncontravention** | **30** |
| **Section 4.4** | **Litigation** | **30** |

i

Section 4.5     **Financial Capacity** ........................................................ **30**
Section 4.6     **Adequate Assurances Regarding Executory Contracts** .. **30**
Section 4.7     **Good Faith Purchaser**................................................... **30**
Section 4.8     **Brokers' Fees** .............................................................. **31**
Section 4.9     **No Outside Reliance** .................................................... **31**

ARTICLE V PRE CLOSING COVENANTS ................................................ 31

Section 5.1     **Certain Efforts; Cooperation**...................................... **31**
Section 5.2     **Notices and Consents** ................................................. **32**
Section 5.3     **Bankruptcy Actions** .................................................... **33**
Section 5.4     **Conduct of Business** ................................................... **36**
Section 5.5     **[Intentionally deleted]**................................................ **37**
Section 5.6     **Access.** ......................................................................... **37**
Section 5.7     **Press Releases and Public Announcements** ................. **38**
Section 5.8     **Bulk Transfer Laws** .................................................... **38**

ARTICLE VI OTHER COVENANTS ......................................................... 38

Section 6.1     **Cooperation** ................................................................ **38**
Section 6.2     **Further Assurances** .................................................... **38**
Section 6.3     **Availability of Business Records**................................. **39**
Section 6.4     **Employee Matters** ....................................................... **39**
Section 6.5     **Recording of Intellectual Property Assignments** ......... **41**
Section 6.6     **Transfer Taxes** ........................................................... **41**
Section 6.7     **Wage Reporting** .......................................................... **42**
Section 6.8     **Release.** ....................................................................... **42**
Section 6.9     **Insurance Policies**....................................................... **42**
Section 6.10    **Collection of Accounts Receivable**.............................. **42**
Section 6.11    **Data Privacy Protection** ............................................. **43**
Section 6.12    **Alternate Transactions** ............................................... **44**
Section 6.13    **Covenant Not to Sue** ................................................... **44**

ARTICLE VII CONDITIONS TO CLOSING ............................................... 44

Section 7.1     **Conditions to Buyer's Obligations** ............................. **44**
Section 7.2     **Conditions to Sellers' Obligations** ............................. **45**
Section 7.3     **No Frustration of Closing Conditions** ........................ **46**
Section 7.4     **Waiver of Conditions**.................................................. **46**

ARTICLE VIII TERMINATION ............................................................... 46

Section 8.1     **Termination of Agreement**........................................... **46**
Section 8.2     **Procedure upon Termination**....................................... **48**
Section 8.3     **Breakup Fee and Expense Reimbursement**.................... **48**
Section 8.4     **Effect of Termination.** ................................................. **48**

ARTICLE IX MISCELLANEOUS ............................................................. 49

Section 9.1     **Remedies** ..................................................................... **49**
Section 9.2     **Expenses**...................................................................... **49**
Section 9.3     **Entire Agreement**........................................................ **49**

ii

| | | |
|---|---|---|
| **Section 9.4** | **Incorporation of Schedules, Exhibits and Disclosure Schedule** | **50** |
| **Section 9.5** | **Amendments and Waivers** | **50** |
| **Section 9.6** | **Succession and Assignment** | **50** |
| **Section 9.7** | **Notices** | **50** |
| **Section 9.8** | **Governing Law; Jurisdiction** | **51** |
| **Section 9.9** | **Consent to Service of Process** | **52** |
| **Section 9.10** | **WAIVERS OF JURY TRIAL** | **52** |
| **Section 9.11** | **Severability** | **52** |
| **Section 9.12** | **No Third Party Beneficiaries** | **52** |
| **Section 9.13** | **No Survival of Representations, Warranties and Agreements** | **52** |
| **Section 9.14** | **Non-Recourse** | **53** |
| **Section 9.15** | **No Right of Set-Off** | **53** |
| **Section 9.16** | **Construction** | **53** |
| **Section 9.17** | **Computation of Time** | **53** |
| **Section 9.18** | **Mutual Drafting** | **53** |
| **Section 9.19** | **Disclosure Schedule** | **54** |
| **Section 9.20** | **Headings; Table of Contents** | **54** |
| **Section 9.21** | **Counterparts; Facsimile and Email Signatures** | **54** |
| **Section 9.22** | **Time of Essence** | **54** |

| | | |
|---|---|---|
| Exhibit A | - | Form of Bill of Sale |
| Exhibit B | - | Form of Assignment and Assumption Agreement |
| Exhibit C | - | Form of Trademark Assignment Agreement |
| Exhibit D | - | Form of Domain Name Assignment Agreement |
| Exhibit E | - | Form of Sale Procedures Order |
| Exhibit F | - | Form of Sale Order |

| | | |
|---|---|---|
| Schedule I | - | Schedule of Seller Entities |
| Schedule 2.2(p) | - | Excluded Assets |
| Schedule 2.6(a) | - | Assumed Contract List |
| Schedule 3.3(b) | - | Consents and Approvals |
| Schedule 3.6 | - | Contracts |
| Schedule 3.7 | - | Intellectual Property |
| Schedule 3.8 | - | Litigation |
| Schedule 3.9 | - | Employees and Employment Matters |
| Schedule 3.11(b) | - | Real Property |
| Schedule 3.12 | - | Permits |
| Schedule 3.15 | - | Environmental Matters |
| Schedule 5.4 | - | Conduct of Business |
| Schedule 6.4 | - | Employee Matters |

PHIL1 9186278v.4
110880660v14

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of November 4, 2020, by and among **FURNITURE FACTORY ULTIMATE HOLDING, L.P.**, a Delaware limited partnership ("FFU Holding"), each of the Subsidiaries of FFU Holding set forth on Schedule I attached hereto (the "Seller Subsidiaries", and together with FFU Holding, "Sellers"), and American Freight FFO, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers presently conduct the business of operating retail furniture, bedding and mattress stores and related manufacturing activities, in several states and over the internet (collectively, the "Business");

WHEREAS, on or before November 4, 2020, Sellers intend to file voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, Sellers intend to seek the entry of the Sale Procedures Order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") upon the terms and subject to the conditions set forth herein and in the Sale Procedures Order;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the general partner, board of managers, the board of directors or other applicable governing body of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the Contemplated Transactions provided for herein pursuant to the Sale Procedures Order and the Sale Order and has approved this Agreement, subject to higher and better offers as contemplated by the Sale Procedures Order; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to higher and better offers as contemplated by the Sale Procedures Order, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

"401(k) Plan" means the FFO 401(k) Plan, dated June 10, 2020, by and FFO Home 401(k) Plan and Mass Mutual Financial Group, Plan Number 849843.

"503(b)(9) Claims" means any claims against the Sellers under section 503(b)(9) of the Bankruptcy Code timely filed and served in accordance with the Bankruptcy Code.

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, Credit Card Receivables, Financing Company Receivables, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, pursuant to the Sale Procedures Order, (a) accept a Qualified Bid, other than that of Buyer, as the highest and best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a plan or refinancing, all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but does not mean the sale of assets to customers conducted in the Ordinary Course of Business.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Contract List" has the meaning set forth in Section 2.6(a).

"Assumed Contracts" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to Section 2.6 and section 365 of the Bankruptcy Code. For the avoidance of doubt, "Assumed Contracts" shall not include (i) any Non-Real Property Contract or Lease that is excluded and rejected pursuant to Section 2.6 or (ii) any Employee Benefit Plan.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Auction" means the auction for the sale and assignment of the Purchased Assets as specified in the Sale Procedures Order.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Breakup Fee" has the meaning set forth in Section 8.3.

"Budget" means the "Budget" as defined in and under the DIP Term Sheet, a copy of which Budget is attached to the DIP Term Sheet, and a copy of which Budget will be attached to the DIP Agreement.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Group" means Buyer, any Affiliate of Buyer and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, representatives, successors or permitted assigns.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, section 4980B of the IRC, and any similar state Law.

"Committee" means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Confidentiality Agreement" means that Confidentiality Agreement dated September 24, 2020, by Franchise Group, Inc. (an Affiliate of Buyer) in favor of Sellers, regarding the terms and conditions on which Sellers would make available certain information.

"<u>Consent</u>" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"<u>Contemplated Transactions</u>" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"<u>Contract</u>" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"<u>COVID-19 Measures</u>" means any action taken by any Seller directly in response to COVID-19, including any compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar applicable Law, directive, guidelines or recommendations promulgated by any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization.

"<u>Credit Agreement</u>" has the meaning set forth in the definition of Secured Debt below.

"<u>Credit Card Receivables</u>" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"<u>Cure Amounts</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Cure Notice</u>" has the meaning set forth in <u>Section 5.3(h)</u>.

"<u>Current Employees</u>" means all individuals employed by Sellers as of the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability with, in each case, the legal right to return to employment).

"<u>Customer Deposits</u>" has the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Dataroom</u>" has the meaning set forth in <u>Section 4.9</u>.

"<u>Decree</u>" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"<u>DIP Agreement</u>" means that certain Debtor-In-Possession Credit Agreement (including all exhibits and schedules attached thereto (including any budget)) to be entered into between the Sellers and the DIP Lender consistent with that certain Terms for First Lien Secured Super-Priority

4

Debtor In Possession Financing for Furniture Factory Outlet, LLC and Bedding, LLC executed by Buyer and Sellers as of November 4, 2020 (the "DIP Term Sheet").

"DIP Lender" means Buyer or its designee.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means each "employee benefit plan" (as such term is defined in section 3(3) of ERISA, whether or not subject to ERISA) and each other benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, medical and hospitalization, insurance, life, disability, salary continuation, sick pay, vacation, paid time off, welfare and fringe-benefit or other compensation plan, program, policy, agreement or arrangement of any kind, in each case, (i) that are for the benefit of or relating to any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or any ERISA Affiliate, or any spouse, dependent or beneficiary thereof, or (ii) that are maintained, sponsored or contributed to or required to be contributed to, by any Seller or any ERISA Affiliate or in which any Seller or ERISA Affiliate participates or participated or (ii) under which Seller or any ERISA Affiliate has or may have any liability, contingent or otherwise, including without limitation as a result of any previously-terminated plan, program, policy, agreement or arrangement.

"Environmental Laws" all applicable Laws or Decrees of any Governmental Entity concerning pollution (or the cleanup thereof)  or protection of the environment, human health, and natural resources.

"Environmental Notice" means any written directive, notice of violation or infraction, or written notice relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Permit issued to any Seller under or pursuant to any Environmental Law.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business or other entity (whether or not incorporated) that, together with any Seller, would be deemed at any relevant time to be a "single employer" within the meaning of section 414 of the Code or section 4001 of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties to the extent related to any Excluded Asset or Excluded Liability.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Utility Deposits" means any utility deposits related exclusively to Excluded Assets.

"Expense Reimbursement" has the meaning set forth in Section 8.3.

"Express Representations" has the meaning set forth in Section 4.9.

"FFO" means Furniture Factory Holding, LLC, a Delaware limited liability company.

"FFU Holding" has the meaning set forth in the preamble.

"Final Order" means an order entered by the Bankruptcy Court, the implementation, operation, or effect of which has not been stayed and as to which order (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or writ of certiorari has expired and as to which no appeal or petition for review or rehearing or certiorari has been taken and is pending; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause such order not to be a Final Order.

"Financing Company Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are affected through customer's applications for and payment of any amounts owed to any Seller through a finance company.

"Former Employees" means all individuals who have been employed previously by the Sellers (or any of their predecessors) who are not Current Employees.

"GBS Supplier Agreement" means that certain Supplier Agreement, dated June 15, 2018 (with a "Program Start Date" of August 1, 2018), by and between GBS Enterprises Inc. and Furniture Factory Outlet, LLC, as amended.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any material, substance, chemical, petroleum or petroleum-derived products, radon, radioactive materials or wastes, lead or lead-containing materials, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is defined as hazardous, acutely hazardous, or toxic under Environmental Laws, or that is a per- or polyfluoroalkyl substance.

"Information Presentation" has the meaning set forth in Section 4.9.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction

6

throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets; and (e) all other intellectual property rights related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iii).

"Inventory" means all of Sellers' inventory of furniture, mattresses, bedding, accessories, raw materials and work-in-process therefor and all of Sellers' tangible property used in the manufacturing of mattresses and bedding materials, including, packaging materials, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers which is used in the Business.

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, rights of use, encroachments, judgments, rights of setoff, conditional

sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Purchased Assets (taken as a whole); <u>provided</u>, <u>however</u>, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military, cyber or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes attributable to or arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Buyer or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Buyer, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers, lessors, suppliers, vendors or other commercial partners; (v) arising from or relating to any existing event, occurrence, or circumstance with respect to which Buyer has knowledge as of the date hereof, including any matter set forth in the schedules hereto, (vi) arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Entity, (vii) resulting from any act of God or other force majeure event (including natural disasters, disease, epidemics, pandemics (including COVID-19 and COVID-19 Measures) or famine); (viii) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement, filing or pendency of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; (ix) seasonal changes in the results of operations (provided that such seasonal changes are consistent with the historic experience of the Business); (x) changes in Law or in GAAP or

8

interpretations thereof; or (xi) inaction by Sellers due to Buyer's refusal to consent to a request for consent by Seller under <u>Section 5.4</u> hereof; or (b) would reasonably be expected to prevent or materially delay the ability of Sellers to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"<u>Non-Real Property Contracts</u>" means the Contracts to which any Seller is a party other than the Leases.

"<u>Offeree</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

"<u>Off-the-Shelf Software</u>" means off-the-shelf personal computer software as such term is commonly understood, that is commercially available under non-discriminatory pricing terms on a retail basis for less than $1,500 per seat and used solely on the desktop personal computers of the Business.

"<u>Ordinary Course of Business</u>" means the ordinary course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 8.1(c)</u>.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Permit</u>" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"<u>Permitted Liens</u>" means (a) Liens for utilities and Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; and (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Petition Date</u>" means the date of the filing of the Chapter 11 Cases.

"<u>PII</u>" has the meaning set forth in <u>Section 6.11</u>.

"<u>Priority Claim</u>" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"<u>Professional Services</u>" means any legal services, accounting services, financial advisory services, investment banking services or any other professional services provided by the Sellers' advisers obtained pursuant to any order of the Bankruptcy Court.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Purchased Avoidance Actions</u>" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code relating to the Business and the Purchased Assets.

"<u>Qualified Bid</u>" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

"<u>Records</u>" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"<u>Registered</u>" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"<u>Related Agreements</u>" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"<u>Representative</u>" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"<u>Sale Hearing</u>" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"<u>Sale Motion</u>" means a combined motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Order.

"<u>Sale Order</u>" has the meaning set forth in <u>Section 5.3(b)(ii)</u>.

"<u>Sale Order Deadline</u>" means December 17, 2020, unless extended by the Seller.

10

"<u>Sale Procedures Motion</u>" means a combined motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Procedures Order.

"<u>Sale Procedures Order</u>" has the meaning set forth in <u>Section 5.3(b)(i)</u>.

"<u>Sale Procedures Order Deadline</u>" means November 25, 2020, unless extended by the Seller.

"<u>Secured Debt</u>" means the senior secured debt of one or more of the Sellers owing to Buyer pursuant to that certain Credit Agreement, dated as of June 10, 2016 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among FFO and certain of its Affiliates and Subsidiaries, the lenders from time to time party thereto, and Stellus Capital Investment Corporation, as Administrative Agent (as subsequently assigned to Buyer).

"<u>Seller</u>" or "<u>Sellers</u>" has the meaning set forth in the preamble.

"<u>Seller Subsidiaries</u>" has the meaning set forth in the preamble.

"<u>Sellers' Knowledge</u>" (or words of similar import) means the actual knowledge of Hank Mullany and Don Roach after reasonable inquiry of those direct reports who would reasonably be expected to have actual knowledge of the matter in question.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"<u>Tax</u>" or "<u>Taxes</u>" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, <u>ad valorem</u>, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

11

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

"Wind Down Cash" has the meaning set forth in Section 2.5.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens relating to or included in the Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) as of the Closing, including:

(a)    all Accounts Receivable of Sellers, including all Credit Card Receivables and Financing Company Receivables, as of the Closing;

(b)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)    without duplication, all deposits (including, without limitation, deposits in transit, customer deposits (the "Customer Deposits") and security deposits for rent, electricity, telephone, utilities or otherwise, but excluding deposits that constitute Excluded Utility Deposits) and other prepaid charges and expenses, credits, advance payments, charges and fees of Sellers that relate to the Purchased Assets;

(d)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(e)    all Intellectual Property owned by Sellers;

(f)    all industrial and motor vehicles owned by Sellers;

(g)    all items of machinery, equipment, supplies, furniture, fixtures, and leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

12

(h)    all Records (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon reasonable request and at no charge), but excluding (i) personnel files for Current Employees and Former Employees of Sellers who are not hired by Buyer as of the Closing Date and (ii) any materials exclusively related to any Excluded Assets and copies of all information relating solely to the Taxes and Tax Returns of the Business or the Purchased Assets in the possession of Sellers;

(i)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any non-disclosure and confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, independent contractors and agents of any Seller or with third parties for the benefit of any Seller, in each case to the extent relating to the Business, the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(j)    all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Business to the extent transferrable and held by Sellers;

(k)    the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(l)    except for the Wind Down Cash and any cash received in connection with any of the other Excluded Assets (including any Tax refund), all cash, cash equivalents, bank deposits and similar cash items of Sellers to the extent such amounts exceed the amount of Sellers' operational expenses, accrued or incurred between the Petition Date and the Closing Date, that remain unpaid following the Closing Date, consistent in all respects with the Budget and Permitted Variances (as such term is defined in the DIP Term Sheet and the DIP Agreement) (such amounts that exceed the amount of such accrued or incurred operating expenses, the "Excess Cash");

(m)    all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including Customer Deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

(n)    except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, recoupment, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Purchased Avoidance Actions;

13

(o)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(p)    all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business; and

(q)    all other assets that are related to, used in or which could be used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)    the Wind Down Cash, any cash received in connection with any of the other Excluded Assets (including any Tax refund), and the cash, cash equivalents, bank deposits and similar cash items of Sellers that do not constitute Excess Cash;

(b)    all bank accounts of Sellers;

(c)    all deposits that constitute Excluded Utility Deposits;

(d)    all of Sellers' certificates of formation or certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company, corporation or other entity;

(e)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(f)    all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts;

(g)    the Excluded Claims;

(h)    any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(i)    any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any

14

Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(j)    all Permits other than the Assumed Permits;

(k)    all directors' and officers' liability insurance policies, including any tail insurance policies, and all rights of any nature with respect to any such insurance policies, including any recoveries thereunder and any rights to assess claims seeking any such recoveries;

(l)    all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments, in each case for Taxes owed the Sellers for periods ending on or prior to December 31, 2020;

(m)    all Insurance Policies and any prepaid premiums with respect thereto;

(n)    any assets expressly excluded from Purchased Assets pursuant to Section 2.1;

(o)    all Employee Benefit Plans and trusts, Insurance Policies, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Employee Benefit Plan;

(p)    the assets listed on Schedule 2.2(p); and

(q)    the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3    Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.6), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "Assumed Liabilities"):

(a)    the Cure Amounts under any and all Assumed Contracts;

(b)    Liabilities under the Assumed Contracts and the Assumed Permits from and after the Closing Date as well as any Liabilities arising out of the conduct of the business or the ownership of the Purchased Assets, in each case, by Buyer from and after the Closing Date, other than any liabilities arising out of any breach, default or failure to perform on or prior to the Closing Date under any Assumed Contract or Assumed Permit;

15

(c)    all accrued and unpaid payroll, accrued and unused vacation, and accrued and unpaid payroll Taxes, in each case, as of the Closing Date (and not paid by Sellers prior thereto) for all Transferred Employees; provided, however, that the Assumed Liabilities shall not include any unpaid payroll or payroll Taxes which accrued prior to the Petition Date;

(d)    all obligations to garnish wages or pay worker's compensation for Employees that are Transferred Employees, to the extent arising and related to the period following the Closing Date; provided, however, that the Assumed Liabilities shall not include any garnishments or worker's compensation amounts owed by Sellers which are in default or in arrears as of the Closing Date;

(e)    to the extent required by applicable law, Liabilities relating to continuation of health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date;

(f)    all Liabilities for Customer Deposits as of the Closing Date;

(g)    all gift certificate obligations of Sellers as of the Closing Date (excluding any escheatment claims);

(h)    all Transfer Taxes in accordance with <u>Section 6.6</u>;

(i)    any and all personal property Taxes with respect to the Purchased Assets to the extent that they are not otherwise satisfied under the Budget and DIP Agreement; and

(j)    all valid customer warranty claims arising in connection with the GBS Supplier Agreement (provided, however, for the avoidance of doubt, it is stipulated and agreed that Buyer or its designee (and not GBS Enterprises Inc.) shall be responsible for satisfying and addressing any such valid warranty claims).

**Section 2.4    <u>Excluded Liabilities</u>**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>"). For avoidance of doubt, Excluded Liabilities include but are not limited to (i) any liabilities or obligations under the Employee Benefit Plans, whether arising prior to, on or after the Closing Date, and (ii) any liabilities and obligations that are not Assumed Liabilities relating to any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or any ERISA Affiliate, with respect to their employment and/or termination of employment with any Seller or any ERISA Affiliate, or any spouse, dependent or beneficiary thereof, including, without limitation, any liability or obligation under any Employee Benefit Plan or any other employee benefit plans, programs or arrangements with respect to which any Seller or ERISA Affiliate has or may have any liability, contingent or otherwise (including, without limitation, any liabilities arising prior to the Closing for vacation pay, sick pay, holiday pay, paid time off, wages, salary, bonuses, severance or other payments or liabilities of any kind

16

to any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or any ERISA Affiliate or any contributions, remittances, premiums, or other amounts to be made to any Employee Benefit Plan) and any liability under any employment agreement, offer letter, consulting agreement or similar agreement between any Seller or any ERISA Affiliate and any current or former directors, officers, managers, employees, consultants or other service providers of any Seller or ERISA Affiliate, excluding for purposes of clauses (i) and (ii) the liabilities and obligations for (x) accrued payroll, accrued and unused vacation, and accrued payroll Taxes, in each case, as of the Closing Date (and not paid by Sellers prior thereto) for all Transferred Employees, to the extent arising and related to the period following the Petition Date, and (y) accrued bonuses as of the Closing Date (and not paid by Sellers prior thereto) for store managers who are Transferred Employees, to the extent arising and related to the period following the Petition Date.

Section 2.5    **Consideration**. As consideration for the sale and transfer of the Purchased Assets, Buyer shall, in addition to the assumption by Buyer of the Assumed Liabilities, (i) credit bid a portion of the Secured Debt in an amount of $7,000,000 pursuant to section 363(k) of the Bankruptcy Code, (ii) credit bid up to the amount of all outstanding obligations under the DIP Agreement as of the Closing Date pursuant to section 363(k) of the Bankruptcy Code, and (iii) make a cash payment to Sellers (via wire transfer of immediately available funds into a bank account designed in writing by Sellers) in an amount of $739,000 to fund the wind-down of the Sellers' estates and the closure of the Chapter 11 Cases (such amount, the "Wind Down Cash"). The consideration described in this Section 2.5 is collectively referred to herein as the "Purchase Price."

Section 2.6    **Assumption and Assignment of Contracts**.

(a)    Schedule 2.6(a) of the Disclosure Schedule (the "Assumed Contract List") sets forth a list of all Contracts and Leases to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract. Buyer shall have the right, at no cost to any Seller, to amend the Assumed Contract List in any respect at any time prior to the Closing Date; provided that no such change of the Assumed Contract List shall reduce the amount of the Purchase Price.

(b)    In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this Section 2.6, (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts for the assumption thereof and assignment to Buyer as provided herein and in the Sale Order (such amounts, the "Cure Amounts"), shall be paid by Buyer at the Closing, or at such later date as shall be approved by the Bankruptcy Court or as may be agreed to by the counterparty to such Assumed Contract, and not by Sellers and Sellers shall have no Liability therefor, and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this Section 2.6(b) shall reduce, directly or indirectly, any consideration payable to or received by Sellers hereunder and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

17

(c)     Sellers shall use their respective commercially reasonable efforts to assign the Assumed Contracts to Buyer, including using commercially reasonable efforts to facilitate negotiations with the counterparties to such Assumed Contracts and to obtain an order of the Bankruptcy Court (which shall be the Sale Order) containing a finding that the proposed assignment to and assumption of the Assumed Contracts by Buyer, on the terms set forth in this Section 2.6, satisfies all applicable requirements of section 365 of the Bankruptcy Code. At the Closing, the Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assign to Buyer each of the Assumed Contracts that is capable of being assigned and assumed by Buyer pursuant to the terms of such Assumed Contract or the Sale Order.

(d)     In the event Sellers are unable to assign any such Assumed Contract to Buyer without the Consent of another Person, which Consent has not been obtained prior to Closing or pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder (including with respect to the Cure Amounts) and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(e)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) requires a Consent of any Governmental Entity or other third party (except as permitted without such Consent by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) constitutes an Employee Benefit Plan or an Insurance Policy. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing. If any such Consent shall not be obtained, or if any attempted assignment of such Contract or Permit would be ineffective or would impair Buyer's rights under the such Contract or Permit in question so that Buyer would not in effect acquire the benefit of such rights, such Seller, to the maximum extent permitted by Law and the applicable Contract or Permit (and subject to any approval of the Bankruptcy Court that may be required) and at Buyer's sole cost and expense, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the applicable Contract or Permit, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder (including with respect to the Cure Amounts) and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.  Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.6(e).

18

Section 2.7    <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. local time on the date (the "<u>Closing Date</u>") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in <u>Article VII</u> (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. The Closing shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

Section 2.8    <u>Deliveries at Closing</u>.

(a)    At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.    one or more Bills of Sale substantially in the form of <u>Exhibit A</u> attached hereto ("<u>Bill of Sale</u>");

ii.    one or more Assignment and Assumption Agreements substantially in the form of <u>Exhibit B</u> attached hereto ("<u>Assignment and Assumption Agreement</u>");

iii.    instruments of assignment substantially in the forms of <u>Exhibit C</u>, and <u>Exhibit D</u> attached hereto for each registered patent, registered copyright, registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "<u>Intellectual Property Assignments</u>");

iv.    any other Related Agreements required to be executed by Sellers;

v.    a copy of the Sale Order;

vi.    the certificate described in <u>Section 7.1(i)</u>; and

vii.    to the extent applicable, a non-foreign affidavit from each Seller, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the IRC stating that such Seller is not a "foreign person" as defined in section 1445 of the IRC; and

viii.    such other bills of sale, assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and assumption of Assumed Liabilities by Buyer.

(b)    At the Closing, Buyer shall deliver to Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

i.      the Bills of Sale;

ii.     the Assignment and Assumption Agreement(s);

iii.    the Intellectual Property Assignments;

iv.     any other Related Agreements required to be executed by Buyer;

v.      the certificate described in <u>Section 7.2(d)</u>; and

vi.     such other bills of sale, assignments and other instruments of transfer or conveyance as Sellers may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and assumption of Assumed Liabilities by Buyer.

**Section 2.9      Allocation**.  No later than sixty (60) days after Closing or within a reasonable time thereafter as agreed by Sellers and Buyer, Buyer shall prepare and deliver to Sellers a proposed allocation of the Purchase Price (plus the Assumed Liabilities and any other Liabilities deemed assumed by the Purchaser for U.S. federal income Tax purposes) among the Purchased Assets which shall be prepared in a manner consistent with section 1060 of the IRC (the "<u>Proposed Allocation Schedule</u>").  After receipt of the Proposed Allocation Schedule from Buyer, the Sellers shall have fifteen (15) days to review the Proposed Allocation Schedule.  The Proposed Allocation Schedule will be considered final and binding on the Parties unless Sellers communicate to Buyer objections to the Proposed Allocation Schedule (an "<u>Allocation Dispute Notice</u>").  Sellers and Buyer shall, within ten (10) days (or such longer period as Sellers and Buyer may agree in writing) following delivery of an Allocation Dispute Notice (the "<u>Allocation Resolution Period</u>"), attempt in good faith to resolve their differences and prepare a final allocation schedule that is acceptable to both Sellers and Buyer.  If Sellers and Buyer are unable to completely resolve any such differences within such ten (10) day period, then each of Sellers and Buyer shall be permitted to file their respective Tax Returns (including amended returns and claims for refund) and information reports (including on IRS Form 8594 or in any audit or other examination or proceeding relating to Taxes) in a manner that is inconsistent with the other Party, taking into account the unresolved differences with respect to the Proposed Allocation Schedule.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date that, except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"), the statements contained in this <u>Article III</u> are true and correct.

**Section 3.1      Organization of Sellers; Good Standing**.

(a)     Each Seller is duly incorporated or organized, validly existing and in good standing under the Laws of its state of incorporation or formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite

20

corporate, limited partnership, limited liability company or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Except as a result of the commencement of the Chapter 11 Cases, each Seller is duly authorized to do business and is in good standing as a foreign corporation, limited partnership or limited liability company, as applicable, in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2    Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    each Seller has all requisite corporate limited partnership or limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3    Noncontravention; Consents and Approvals**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, certificate of limited partnership, certificate of formation,

limited partnership agreement, operating agreement or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) subject to the entry of the Sale Order, conflict with, any Assumed Contract.

(b)    Except as set forth in <u>Schedule 3.3(b) of the Disclosure Schedule</u>, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4**    <u>**Compliance with Laws**</u>. Sellers are in compliance with, and since January 1, 2017 have been in compliance with, all Laws applicable to the Business or the Purchased Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect. To Sellers' Knowledge, none of the Sellers are under investigation with respect to any violation of any applicable Laws.

**Section 3.5**    <u>**Title to Purchased Assets**</u>. Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.6</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

**Section 3.6**    <u>**Contracts**</u>. Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material Contracts (including amendments, supplements or modifications thereto) to which a Seller is a party with respect to the Business, the Purchased Assets or the Assumed Liabilities as of the date hereof (each such Contract, a "<u>Material Contract</u>"), and Sellers have made available to Buyer true and complete copies of all such Material Contracts. Except as set forth in <u>Schedule 3.6 of the Disclosure Schedule</u>, each Material Contract is valid, binding and enforceable against each such Seller, as applicable, and, to the Sellers' Knowledge, the other parties thereto, in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity), and is in full force and effect.  Except as set forth in <u>Section 3.6 of the Seller Disclosure Letter</u> and other than as a result of the filing and pendency of the Chapter 11 Cases, no Seller is in

22

material breach of or material default under any Material Contract to which it is a party, and, to Sellers' Knowledge, no other Person is in material breach of or material default under any Material Contract.

**Section 3.7    Intellectual Property**.

(a)    Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Business, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens (except for Permitted Liens and subject to entry of the Sale Order), and all such Registered Intellectual Property is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge and except as set forth on Schedule 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

**Section 3.8    Litigation**. Other than the Chapter 11 Cases, Schedule 3.8 of the Disclosure Schedule sets forth all unresolved material Litigation brought by or against any Seller with respect to the Business or any of the Purchased Assets, and to Sellers' Knowledge, there is no other material Litigation threatened in writing, before any Governmental Entity against any Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Contemplated Transactions.

**Section 3.9    Employees and Employment Matters**.

(a)    No Seller is a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), nor is there any Union representing or purporting to represent any employee of the Sellers. Sellers are not aware of any ongoing or threatened, strike, slowdown, walkout, work stoppage, or other similar labor disruption or dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, no Union or group of employees is seeking to organize any employees of Sellers for the purpose of collective bargaining. Sellers has made available to Buyer a list of all Current Employees and the following information with respect to each such Current Employee: name; job title (including any part time status); work location; date of hire; the current year's base compensation and, separately, any promised or targeted bonus, commission or other incentive-based compensation; exempt or non-exempt status; visa status if not a United States citizen; and, if on leave, date of expected return. Except as set forth in Schedule

23

3.9(a) of the Disclosure Schedule, all Current Employees are "employees at will," and their employment may be terminated at any time. As of the Petition Date, all compensation, including wages, commissions, bonuses, fees and other compensation, payable to all employees, independent contractors or consultants of Sellers for services performed have been paid in the Ordinary Course of Business in accordance with the Sellers' normal payroll practices.

(b)     Except as set forth in Schedule 3.9(b) of the Disclosure Schedule, Sellers are in compliance in all material respects with all applicable Laws respecting labor and employment practices pertaining to any of its employees, consultants and independent contractors, including without limitation, Laws concerning fair employment practices, terms and conditions of employment, employment discrimination, harassment, retaliation, disability rights labor relations and collective bargaining, employee classification (as exempt or non-exempt, and as employee or independent contractor), wages, hours, overtime compensation, privacy, occupational health and safety, workers' compensation and immigration.

(c)     Except as set forth in Schedule 3.9(c) of the Disclosure Schedule, since December 31, 2018, none of the Sellers has engaged in any "mass layoff" or "plant closing," as those terms are defined in the Worker Adjustment and Retraining Notification Act or any similar state or local legislation (collectively, "WARN"), and none of the Sellers has any outstanding WARN Liabilities. Seller has no plans to undertake any action that would trigger the WARN Act.

**Section 3.10    Employee Benefit Plans.**

(a)     With respect to each Employee Benefit Plan of any Seller:

i.     such Employee Benefit Plan, if intended to meet the requirements of a "qualified plan" under section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service on the current form of the Employee Benefit Plan or is based on a master or prototype plan that has received a favorable opinion letter issued by the United States Internal Revenue Service upon which it can rely, as to the qualified and tax-exempt status of the Employee Benefit Plan and related trust, and nothing has occurred, and, to the Knowledge of Sellers, no conditions or circumstances exist, that would reasonably be expected to cause the revocation of such qualified or tax-exempt status; and

ii.     Sellers have provided to Buyer copies of all such Employee Benefit Plans and any related trusts, Insurance Policies or other such funding vehicles, and any other documents as Buyer has reasonably requested.

(b)     Each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws, including without limitation, ERISA, the Code, the Health Insurance Portability and Accountability Act of 1996, as amended, and the Patient Protection and

Affordable Care Act of 2010, as amended. As of the date hereof, there is no pending or, to Sellers' Knowledge, threatened, Litigation relating to any Employee Benefit Plan.

(c)    Neither Seller, nor any ERISA Affiliate, has at any time been a party to or maintained, sponsored, contributed to, or been obligated to contribute to, or had any liability, contingent or otherwise, with respect to: (i) any plan subject to the minimum funding standards of Section 302 of ERISA or Title IV of ERISA or Sections 412 and 430 of the Code; (ii) any "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA or Code Section 414(f)); (iii) any "multiple employer plan" (within the meaning of ERISA or Section 413(c) of the Code); (iv) any voluntary employees' beneficiary association (within the meaning of Section 501(c)(9) of the Code); or (v) any "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(d)    Other than as required under COBRA, no Employee Benefit Plan provides benefits or coverage in the nature of health, life, disability insurance or other welfare benefits (other than death benefits when termination occurs upon death) following retirement or other termination of employment.  No Tax under Sections 4980B, 4980D, 4980H, 5000, 6721 or 6722 of the Code has been incurred with respect to any Employee Benefit Plan and, to the Knowledge of Sellers, no circumstance exists which could give rise to any such Tax.

(e)    All required contributions (including all employer contributions and employee salary reduction contributions), premiums and other payments for the current plan year or any plan year ending on or before the Closing Date that are due on or before the Closing Date, under all Employee Benefit Plans will have been made or properly accrued on or before the Closing Date. All contributions to any Employee Benefit Plan have been contributed within the time specified in ERISA and the Code and the respective regulations thereunder.

**Section 3.11    Real Property**.

(a)    Sellers do not own any real property.

(b)    Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property. Sellers have made available to Buyer true and complete copies of such Leases, as amended through the date hereof. Each of the Sellers has a valid leasehold interest in the leases, subleases, licenses or other occupancies to which each such Seller is a party as tenant for Lease Real Property related to the ownership or operation of the Business, in each case, free and clear of all Liens, except for Permitted Liens.

**Section 3.12    Permits**.  Schedule 3.12 of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the date hereof in connection with the operations of the Business. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a

25

Material Adverse Effect. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect.

**Section 3.13    [Intentionally deleted]**.

**Section 3.14    Taxes**.    To Sellers' Knowledge, as of the Petition Date, Sellers have withheld and remitted all payroll and employment related Taxes in connection with amounts paid to any Current Employee, Former Employee or independent contractor.

**Section 3.15    Environmental Matters**. Except as set forth in Schedule 3.15 of the Disclosure Schedule:

(a)    Each Seller is, and has been during the prior five (5) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws that are applicable to the operations of the Business;

(b)    No Seller has received during the prior five (5) years written notice from any Governmental Entity regarding any actual or alleged violation of or Liability under Environmental Laws that is applicable to the Business;

(c)    No Seller has received any: (i) Environmental Notice or written Environmental claim; or (ii) written request for information or investigation pursuant to Environmental Law with respect to operations of the Business or any Leased Real Property;

(d)    To Sellers' Knowledge, no Hazardous Substance has been released at any Leased Real Property in violation of any Environmental Law; and

(e)    Sellers have made available to Buyer copies of all environmental audits, permit, permit applications, assessments and reports in its possession relating to Sellers, and the Leased Real Property.

**Section 3.16    [Intentionally deleted]**.

**Section 3.17    [Intentionally deleted]**.

**Section 3.18    Insurance**. Each Seller has all material policies of insurance covering such Seller and the Business and any of its respective employees, properties or assets, including policies of property, fire, workers' compensation, products liability, directors' and officers' liability and other casualty and liability insurance, that is customarily carried by a Person conducting business similar to that of Sellers. All Insurance Policies are in full force and effect, no notice of cancellation has been received and there is no existing default or event that, with notice or lapse of time or both, would constitute a default by any insured thereunder, except for such defaults that would not have a Material Adverse Effect.

**Section 3.19    Product Warranties; Product Liability**.

26

(a)     Sellers have complied in all material respects with all laws and their policies, procedures and specifications with respect to design, manufacture, labeling, testing, inspection and sale of products.  There have been no recalls with respect to any of the products sold by Sellers.  All products manufactured, sold, licensed, leased, provided or delivered by any Seller to customers on or prior to the Closing conform (or will conform on the date provided or delivered) in all material respects to applicable contractual commitments, express and undisclaimed implied warranties, service level commitments, product specifications and product documentation and to any representations made to such customers or users.  Except to the extent reserved for on the most recent balance sheets included in the Financial Statements, no Seller has any liabilities or obligations (whether absolute, contingent or otherwise) (and, to the Sellers' Knowledge, there is no legitimate basis for any present or future suits, actions, claims, proceedings or investigations against any Seller giving rise to any material liabilities or obligations) for replacement, repair or redelivery of any products or services.

(b)     No Seller has, since December 31, 2018, received any written notice with respect to any product liability claim against any Seller asserting that an alleged defect in any product of any Seller (including, without limitation, any past, prior or discontinued product) caused any material injury to any individual or property.  Since December 31, 2018, there have been no notices, citations or decisions by any Governmental Entity that any products sold by any Seller are defective or fail to meet any applicable standards or other regulatory requirements promulgated by any such Governmental Entity.

**Section 3.20   Privacy Policy**. Sellers have all complied in all material respects, and currently comply in all material respects, with (i) the publicly posted privacy policy applicable to Seller's websites ("Privacy Policies") and (ii) all Laws and contractual obligations relating to data privacy, data protection and data security ("Privacy Laws"), including Laws related to the collection, storage, transmission, transfer (including, without limitation, cross-border transfers), disclosure, destruction and use of PII.  Sellers have taken commercially reasonable measures to protect PII in their possession against loss, damage, and unauthorized access or use. Since December 31, 2018, no actions, suits, claims, hearings, arbitrations, or other proceedings have existed or, to Sellers' Knowledge, has been threatened regarding and, to Sellers' Knowledge there has not existed any, (x) violation of such Privacy Policies or any implementation of the Privacy Policies by a Seller, or (y) violation of any Privacy Laws by a Seller. To Sellers' Knowledge, no Seller has been served with an information or enforcement notice (including, without limitation, pursuant to section 40 of the Data Protection Act 1998) by any data protection regulatory authority.

**Section 3.21   Certain Payments; OFAC**.

(a)     Since December 31, 2018, no director, officer, agent or employee of any Seller or any other Person acting for or on behalf of any Seller, has directly or indirectly, (i) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, (C) to obtain special concessions or for special concessions already obtained, for or in respect of any Seller, or (D) in violation of any Law, or (ii)

established or maintained any fund or asset that has not been recorded in the Records of any Seller.

(b)     Since December 31, 2018, no Seller has been a party to any Contract with, and has not conducted business or participated in any transaction involving, (i) any Person identified on the Office of Foreign Assets Control's ("OFAC") list of Specially Designated Nationals and Blocked Persons or targeted by an OFAC Sanctions Program; (ii) the government, including any political subdivision, agency, instrumentality, or national thereof, of any country with respect to which the United States or any jurisdiction in which any Seller is operating or located administers or imposes economic or trade sanctions or embargoes; (iii) any Person acting, directly or indirectly, on behalf of, or an entity that is owned or controlled by, a Specially Designated National and Blocked Person or by a government or Person identified in clause (ii) above, or (iv) a Person on any other similar export control, terrorism, money laundering or drug trafficking related list administered by any Governmental Entity either within or outside the United States with whom it is illegal to conduct business pursuant to applicable Law in each case, in violation of any applicable Law.

**Section 3.22    Brokers' Fees**. Except for amounts due to FocalPoint Securities, LLC, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.23    No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR

28

REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES).

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS <u>SECTION 3.23</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1**    **Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2**    **Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms

29

and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3      Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

**Section 4.4      Litigation**.  There are no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

**Section 4.5      Financial Capacity**. Buyer has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated by this Agreement. As of the Closing and immediately after consummating the transactions contemplated by this Agreement, Buyer will not, assuming the accuracy of the Sellers' representations and warranties under this Agreement, (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its liability on its debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in its business, or (c) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured.

**Section 4.6      Adequate Assurances Regarding Executory Contracts**. Buyer is and shall be capable of satisfying as of the Sale Hearing the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

**Section 4.7      Good Faith Purchaser**. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections

of section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith and without any improper conduct, including collusion or fraud of any kind.

**Section 4.8**    **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

**Section 4.9**    **No Outside Reliance**. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made to Buyer or any member of Buyer Group and on which Buyer and Buyer Group may rely in connection with the transactions contemplated by this Agreement.  Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Confidential Information Memorandum prepared by FocalPoint Securities, LLC (the "Information Presentation"), that certain datasite administered by DataSite (the "Dataroom"), any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that neither Buyer nor any member of Buyer Group has relied on any such representations, warranties or statements. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

## ARTICLE V
## PRE CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1**    **Certain Efforts; Cooperation**.

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required

31

in connection with the discharge of their fiduciary duties during the Chapter 11 Cases (including, soliciting higher or better offers for the Purchased Assets in any Auction).

(b)     On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order); provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 5.2     <u>Notices and Consents</u>**.

(a)     To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(b)     Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that (A) Sellers shall not incur any costs associated with the obligations hereunder and (B) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, each of Buyer and Sellers shall (A) promptly notify the other Party of, and if in writing, furnish the other Party with copies of (or in the case of oral communications, advise the other Party of the contents of) any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) permit the other Party the opportunity to review and discuss in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not independently participate in any meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by

32

this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) to remove references concerning financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

(d)    Notwithstanding anything herein to the contrary and subject to clause (B) of the following sentence, the Parties understand and agree that commercially reasonable efforts of Buyer hereto shall not be deemed to include: (i) entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Entity in connection with the transactions contemplated hereby or defending against or initiating any lawsuit, action or proceeding, judicial or administrative, challenging this Agreement or the transactions contemplated hereby, or (ii) proposing, negotiating, agreeing to or offering to commit to any sale, divestiture, license, disposition or separation (including by establishing a trust or otherwise) of, or any limitation on any operation or business of, any of its or its Affiliate's businesses, assets or properties. In furtherance, and not in limitation, of the foregoing in this Section 5.2(d), (A) other than in connection with an Alternative Transaction or dispositions of Inventory in the Ordinary Course of Business (which, in each case, shall not require any consent of Buyer), Sellers shall not, and shall cause their Affiliates not to, propose, negotiate, agree to or offer to commit to any sale, divestiture, license, disposition or separation of any Purchased Asset, without the prior written consent of Buyer, and (B) Buyer shall not be required to agree to any divestiture, sale or other disposition of any of the Purchased Assets or any assets of Buyer or any of Buyer's Affiliates or agree to any limitation on any operation or business of the Buyer or any of its Affiliates.

## Section 5.3    Bankruptcy Actions.

(a)    Sellers will commence the Chapter 11 Cases on or before November 4, 2020.

33

(b)    The Sellers shall file the Sale Motion contemporaneously with the commencement of the Chapter 11 Cases, but in no event later than November 6, 2020, which motion shall seek the Bankruptcy Court's:

i.    entry of an order on or before the Sale Procedures Order Deadline substantially in the form of <u>Exhibit E</u>, in form and substance satisfactory to Buyer, as amended, modified or supplemented with the prior written consent of Buyer (the "<u>Sale Procedures Order</u>"), among other things, (A) establishing bidding procedures governing the sale of the Purchased Assets, as amended, modified or supplemented with the prior written consent of Buyer (the "<u>Bidding Procedures</u>") (B) approving payment of the Break-Up Fee and the Expense Reimbursement, to the extent payable by the terms of this Agreement or the Sale Procedures Order, and (C) providing that the Break-Up Fee and the Expense Reimbursement shall constitute administrative expenses of the Sellers with priority over any and all pre-petition creditors and administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code until paid. The Bankruptcy Court must enter the Sale Procedures Order by the Sale Procedures Order Deadline; and

ii.    entry of an order on or before the Sale Order Deadline substantially in the form of <u>Exhibit F</u>, in form and substance satisfactory to Buyer in its sole and absolute discretion, as amended, modified or supplemented with the prior written consent of Buyer, authorizing and approving, inter alia, (A) the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Liens and Claims (to the extent set forth therein), and (B) the assignment and assumption by Buyer of each Assumed Contract (the "<u>Sale Order</u>"). The Sale Order shall, among other things: (I) approve the sale of the Purchased Assets to the Buyer free and clear of all Liens, Claims, and encumbrances, pursuant to (among other provisions) sections 105, 363, and 365 of the Bankruptcy Code, in each case to the extent set forth in this Agreement; (II) approve the assumption and assignment to the Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code; (III) contain findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Seller; (IV) contain such other terms that are otherwise acceptable to Buyer, in its sole discretion; and (V) the Sale Order shall have become a Final Order.

(c)    The Sellers shall also file a motion on or before November 6, 2020, contemporaneously with the commencement of the Chapter 11 Cases and the filing of the Sale Motion, which motion shall seek an expedited hearing to consider the Sale Motion and Bidding Procedures upon 14 days' notice to the creditors of Sellers and other parties of interest.

(d)    Sellers shall provide Buyer with a reasonable opportunity to review and comment (but in no event less than twenty four (24) hours) upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases.    All motions, applications, and

34

supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be reasonably satisfactory in form and substance to Buyer.

(e)     If the Sale Procedures Order, Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument shall be filed with respect to the Sale Order, Sale Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to Article VIII, the Sellers shall use their commercially reasonable efforts to diligently defend such appeal, petition or motion and shall use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(f)     Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Contemplated Transaction, the Sale Order, Sale Procedures Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel. No Seller shall seek any modification to the Bidding Procedures, Sale Procedures Order or Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Chapter 11 Cases has been appealed, in each case, without the prior written consent of Buyer.

(g)     Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(h)     Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order and the Sale Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(i)     Pursuant to the terms of the proposed Sale Procedures Order, Buyer shall provide information to the Sellers to be disseminated to counterparties to Assumed Contracts, sufficient to satisfy a finding of adequate assurance of future performance as required in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

(j)     Pursuant to the terms of the Bidding Procedures and the proposed Sale Procedures Order, Sellers will solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) in accordance with the procedures set forth in the proposed Sale Procedures Order.

35

(k)      Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens on the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(l)      Sellers shall file with the Bankruptcy Court and serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Sale Procedures Order and provide a copy of the same to Buyer.

**Section 5.4      Conduct of Business**. Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the Final Order (as defined in the DIP Term Sheet), and except as expressly contemplated by this Agreement or as set forth on Schedule 5.4, or required under the Bankruptcy Code or other applicable Law and except to the extent waived by Buyer's prior written consent and except with the prior written consent of Buyer:

(a)      Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(b)      Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(c)      Sellers shall make all post-petition payments related to Assumed Contracts (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof to the extent provided in the Budget contained in any debtor-in-possession financing order of the Bankruptcy Court related to the DIP Agreement;

(d)      Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(e)      Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing (to the any extent that such maintenance does not require the Sellers to incur costs or make any payments), and shall comply with the terms of each such Permit and no Seller shall permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(f)      Sellers shall not sell or otherwise issue new gift certificates with respect to the Business, but shall continue to honor in all respects any outstanding gift certificates issued by the Business in the Ordinary Course of Business and in accordance with past practices;

(g)     Sellers shall (w) conduct the Business in the Ordinary Course of Business, (x) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (y) use commercially reasonable efforts to keep available the services of the Current Employees, and (z) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Employees and others having business dealings with the Business; and

(h)     Sellers shall not: (i) cancel, compromise, waive or release any right with respect to any Purchased Asset; (ii) enter into or amend, modify, supplement, restate or renew in any respect or cancel or terminate or waive any rights under or with respect to any Assumed Contract or Assumed Permit; or (iii) except for such Contracts that Sellers shall file a motion with the Bankruptcy Court as of the Petition Date to reject, assume, reject or assign any Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or to a third party in connection with an Alternate Transaction).

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.5**     **[Intentionally deleted]**.

**Section 5.6**     **Access**.

(a)     Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b)     Prior to the approval of the Contemplated Transactions by the Bankruptcy Court, Buyer will not, and will not permit any member of Buyer Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Sellers with respect to Sellers, the Business or the transactions contemplated by this Agreement without providing (i) reasonable prior notice to Sellers for each such contact and (ii) an opportunity for Sellers to participate in any such conversation; provided, however, that Buyer and the Buyer Group will not be restricted in any manner from contacting any customer, supplier, lessor or other third party in connection with the business of the Buyer Group in the ordinary course of business unrelated to the Contemplated Transactions.

(c)     All information obtained pursuant to this Section 5.6 shall be subject to the terms and conditions of the Confidentiality Agreement and Buyer, to the extent not a party thereto, shall be subject to the same terms and conditions as set forth therein as though an

original party thereto; provided, that notwithstanding anything in the Confidentiality Agreement to the contrary, the Parties agree that the obligations thereunder shall terminate no earlier than the Closing Date and not the date hereof.

**Section 5.7    Press Releases and Public Announcements**. After notice to and consultation with Buyer, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed; provided, however, (i) Sellers, without the prior consent of Buyer, may (A) issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction and (B) communicate with its and its Affiliates' investors and potential investors relating to the transactions contemplated by this Agreement and (ii) Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction.

**Section 5.8    Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the noncompliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing, provided that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and

information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this <u>Section 6.2</u>, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer. Without limiting the generality of this <u>Section 6.2</u>, to the extent that either Buyer or Sellers discovers any assets or properties which the parties mutually agree should have been retained by Sellers as Excluded Assets, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Sellers. If any Seller, Buyer or any of their respective Subsidiaries, from time to time, identifies any Assumed Liability that was not transferred to Buyer, or any Excluded Liability that was transferred to Buyer, Sellers and Buyer shall use their commercially reasonable efforts to transfer those Liabilities to the correct party as promptly as reasonably practicable after Closing.

**Section 6.3** **<u>Availability of Business Records</u>**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge. Without limitation of any of the foregoing, such assistance by Buyer to Sellers shall include reasonable assistance to Sellers by the Transferred Employees after the Closing with respect to the wind down of the Chapter 11 Cases, which shall include during the pendency of the Chapter 11 Cases, maintaining the accounting infrastructure and assisting in the compilation of the Monthly Operating Reports and other reporting and filings that are required to be filed with the Bankruptcy Court.

**Section 6.4** **<u>Employee Matters</u>**.

(a)      Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer), by written offer letter outlining the terms and conditions of the offer of employment, to employ the Current Employees listed on Schedule 6.4, copies of which offers Buyer will deliver to Sellers prior to Closing. For purposes of this Agreement, each Current Employee who receives and accepts such offer of employment prior to the Closing and commences work with Buyer after the Closing Date shall be referred to herein as a "Transferred Employee"; provided, however, any Current Employee who is on short-term disability, leave of absence, paid or unpaid, or long-term disability as of the Closing Date shall remain employed by Sellers, shall not commence employment with Buyer or its designee, and shall not be considered a Transferred Employee, unless and until such Current Employee returns to and commences active employment with Buyer or its designee. Except to the extent Sellers fail to comply in any material respects with Section 6.4(c)(i) and Section 6.4(c)(iii), Buyer hereby agrees that the written offer to a Current Employee shall include a level of base salary, wages and annual bonus opportunities (excluding equity-based incentives) that are substantially comparable in the aggregate to the base salary, wages and annual bonus opportunities (excluding equity-based incentives) provided to such Current Employee by Sellers as of the Closing Date. Notwithstanding anything to the contrary contained herein, Buyer shall hire a sufficient number of Employees of Sellers' headquarters, distribution center and manufacturing operations located in Fort Smith, Arkansas so that fewer than 50 such Employees remain employees of Sellers after the Closing.

(b)      Each Current Employee of Sellers who is not or does not become a Transferred Employee shall be referred to herein as an "Excluded Employee." Other than the Assumed Liabilities, Sellers shall bear responsibility for all Liabilities arising out of, relating to, or with respect to any compensation and employee benefits relating to the employment or termination of employment with the Sellers and their Affiliates of the Current Employees arising on or prior to the time they become Transferred Employees and for Current Employees who are or become Excluded Employees arising on, prior to or after the Closing Date.

(c)      Following the date of this Agreement:

i.      Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours;

ii.      Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Current Employee, or (B) solicit or encourage any Current Employee not to accept, or to reject, any such offer of employment;

iii.      Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such

Representative with respect to its determination of terms and conditions of employment for any Current Employee;

iv.     Sellers shall provide all information reasonably requested by Buyer to determine the Transferred Employees' status as full-time employees under the Patient Protection and Affordable Care Act of 2010, as amended;

v.     Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable with respect to all Current Employees and Former Employees of Sellers. Sellers shall withhold and remit all applicable payroll taxes as required by Law with respect to all Current Employees and Former Employees of Sellers; and

vi.     None of the foregoing shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise. This Section shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section.

(d)     Except for the Assumed Liabilities, Buyer is not assuming nor shall it be liable with respect to any Employee Benefit Plan, and Buyer shall not be obligated to continue or provide to any Transferred Employees any particular benefit or component benefit.  Except for the Assumed Liabilities, Sellers shall remain liable for all liabilities and obligations and claims incurred under the Employee Benefit Plans whether arising prior to, on or after the Closing Date.  Sellers shall be exclusively responsible for all liabilities and obligations arising from Seller's employment or termination of employment of any employee of any Seller who does not become a Transferred Employee (including any severance and other similar costs), and all such liabilities will constitute Excluded Liabilities under this Agreement.

**Section 6.5     Recording of Intellectual Property Assignments**. All of the Intellectual Property Assignments shall be recorded and filed by Buyer (at Buyer's sole cost and expense) with the appropriate Governmental Entities as promptly as practicable following the Closing.

**Section 6.6     Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay any and all sales, use, stamp, documentary, registration, transfer (including real estate transfer tax), stock transfer, registration, gross receipts, duty, securities

41

transactions, stamp, documentary, registration, transfer, added value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by this Agreement, regardless of the Person liable for such Transfer Taxes under applicable Law. Sellers and Buyer shall cooperate to prepare any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. The Party that is responsible under applicable law to file such Tax returns, shall timely file such returns.

Section 6.7 **Wage Reporting**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

Section 6.8 **Release**. Effective upon the Closing, Sellers, on behalf of themselves and their respective past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns (collectively, the "Seller Releasing Parties"), hereby release, remise, acquit and forever discharge (i) the Buyer and its past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (collectively, the "Buyer Released Parties"), from any and all claims, Contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses arising on or prior to the Closing Date, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution, which any Seller Releasing Party has, may have had or may hereafter assert against any Buyer Released Party and (ii) any claim, right or interest of Sellers (whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description) in the Purchased Assets; provided, that notwithstanding the foregoing, Seller Releasing Parties do not in any event release Buyer from its obligations under this Agreement, including the Assumed Liabilities, or the DIP Agreement. In addition, if Sellers file a Chapter 11 plan, such plan shall be consistent with this Agreement in all respects and will include releases and exculpation provisions in favor of Buyer Released Parties to the maximum extent permitted by law.

Section 6.9 **Insurance Policies**. Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer and the Purchased Assets and no further coverage shall be available to Buyer or the Purchased Assets under any such policies.

Section 6.10 **Collection of Accounts Receivable**.

(a)      As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)      As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within one (1) Business Day of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)      As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.11    Data Privacy Protection**. Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of section 363(b) of the Bankruptcy Code, along with associated personal information about the Sellers' customers. In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties. Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets. Buyer shall require express consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection. Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

**Section 6.12   Alternate Transactions**.  Notwithstanding any provision herein to the contrary, nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternate Transactions, including but not limited to marketing the Sellers' assets or providing due diligence materials.

**Section 6.13   Covenant Not to Sue**. Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert (a) any claim relating to any Purchased Avoidance Actions or (b) any claims against Sellers' current or former officers and directors which constitute Purchased Assets before any court, arbitrator, mediator or administrative agency anywhere in the world. Buyer further covenants and agrees that it shall not assign the Purchased Avoidance Actions or claims against Sellers' current or former officers and directors to any third party.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1   Conditions to Buyer's Obligations**.  Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    (i) (A) the Bankruptcy Court shall have entered the Sale Procedures Order by the Sale Procedures Order Deadline and the Sale Order by the Sale Order Deadline, and (B) the Sale Procedures Order and the Sale Order shall each be a Final Order on the Closing Date; and (ii) the Sale Procedures Orders and the Sale Order, as entered by the Bankruptcy Court, shall not modify the terms and conditions of this Agreement or the transactions

44

contemplated hereby in such a manner as to result in a diminution in the benefits of this Agreement to the Buyer;

(e)    the Bankruptcy Court shall not have entered any order (i) appointing a trustee or examiner with respect to the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) dismissing the Chapter 11 Cases;

(f)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(g)    all Consents, if any, required to consummate the transactions contemplated by this Agreement, including with respect to the assignment of any Assumed Contract or Assigned Permit, shall have been obtained;

(h)    the DIP Agreement shall be in full force and effect; and

(i)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(f) has been satisfied.

**Section 7.2    Conditions to Sellers' Obligations**. Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

45

(d)    the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

(e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3    No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4    Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

# ARTICLE VIII
# TERMINATION

**Section 8.1    Termination of Agreement**. This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by written notice of either Buyer or Sellers, upon the issuance by any Governmental Entity of a Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the transactions contemplated by this Agreement, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before December 30, 2020 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of either Buyer or Sellers, if the Chapter 11 Cases is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner is appointed in the Chapter 11 Cases;

(e)    by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Sellers in this Agreement or if Sellers have breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (A) gives rise to a failure of the conditions set forth in <u>Sections 7.1(a)</u> or <u>7.1(b)</u> to be satisfied and (B) (y) is not capable of being cured by the Outside Date or (z) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and fifteen (15) days after delivery by Buyer of written notice to Sellers of such breach, or (ii) in the event that any condition set forth in <u>Section 7.1</u> shall become incapable of being satisfied by the Outside Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(f)    by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (A) gives rise to a failure of the conditions set forth in <u>Sections 7.2(a)</u> or <u>7.2(b)</u> to be satisfied and (B) (y) is not capable of being cured by the Outside Date or (z) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and fifteen (15) days after delivery by Sellers of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in <u>Section 7.2</u> shall become incapable of being satisfied by the Outside Date, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(g)    by written notice from Sellers to Buyer, if all of the conditions set forth in <u>Section 7.1</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by <u>Section 2.7</u>;

(h)    by written notice from Sellers to Buyer, if any Seller or the board of managers (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(i)    automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

      i.    approval by the Bankruptcy Court of an Alternate Transaction, unless Buyer is designated a "back-up bidder" under the Sale Order; or

      ii.    the consummation of an Alternate Transaction; or

(j)    by written notice from Buyer to Sellers if: (i) the Bankruptcy Court does not enter the Sale Procedure Order by the Sale Procedures Order Deadline; (ii) the Bankruptcy Court does not enter the Sale Order by the Sale Order Deadline; or (iii) following entry of

47

the Sale Order or the Sale Procedures Order, either the Sale Order or the Sale Procedures Order is stayed, reversed, modified, vacated or amended in any material respect without the prior written consent of Buyer (such consent not to be unreasonably withheld), and such stay, reversal, modification, vacation or amendment is not eliminated within fourteen (14) days of any such stay, reversal, modification, vacation or amendment;

      (k)    by written notice from Buyer to Sellers if the DIP Agreement matures or is in default (unless otherwise extended or waived by the DIP Lender);

      (l)    by written notice from Buyer to Sellers if the Bankruptcy Court approves a disclosure statement with respect to a Chapter 11 plan filed by any party other than Sellers; or

      (m)    by written notice from Buyer to Sellers if Seller files a Chapter 11 plan without the consent of Buyer.

Notwithstanding anything to the contrary contained herein, in no event may Buyer terminate this Agreement under Section 8.1(e) on account of Buyer's failure to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract.

**Section 8.2**    **Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3**    **Breakup Fee and Expense Reimbursement**. Upon the date Sellers consummate an Alternate Transaction, Sellers shall immediately pay to Buyer a breakup fee equal to the greater of (i) $360,000 or (ii) three percent (3.0%) of the Purchase Price (exclusive of the value of the Assumed liabilities) (the "Breakup Fee"), and an expense reimbursement of actual, necessary and documented out of pocket expenses associated with this Agreement in an amount not to exceed $400,000 (the "Expense Reimbursement"). Sellers' obligation to pay the Breakup Fee and Expense Reimbursement pursuant to this Section 8.3 shall be subject to Bankruptcy Court approval and shall survive termination of this Agreement and shall constitute an administrative expense of Sellers to be paid out of proceeds of an Alternative Transaction or otherwise under section 503(b) of the Bankruptcy Code. If Buyer is entitled to receipt of the Breakup Fee and Expense Reimbursement pursuant to this Section 8.3, the receipt of the Breakup Fee and Expense Reimbursement shall (i) be paid by wire transfer of immediately available funds to an account designated by Buyer within one (1) Business Day of any such termination and (ii) be the liquidated damages of Buyer and Buyer's sole and exclusive remedy for the breach by Sellers of this Agreement.**Effect of Termination**.

      (a)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)     Notwithstanding anything to the contrary in the Confidentiality Agreement, the Confidentiality Agreement shall survive any termination of this Agreement and nothing in this <u>Section 8.4</u> shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement, and Buyer, to the extent not a party thereto, shall be subject to the same terms and conditions as set forth therein as though an original party thereto.

(c)     No termination of this Agreement pursuant to <u>Section 8.1</u> shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the transactions contemplated hereby are not consummated this Agreement shall become null and void and of no further force and effect (except that <u>Article I</u> (Definitions), <u>Article IX</u> (Miscellaneous), and this <u>Article VIII</u> (Termination) shall survive any such termination).

(d)     Nothing herein shall preclude either of the Parties from exercising their remedies under <u>Section 9.1</u>.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1     <u>Remedies</u>**. (i) Each Party recognizes that if such Party breaches or refuses to perform any covenant hereunder, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (ii) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants, (iii) if any action, claim or proceeding is brought by the non-breaching Party to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (iv) each Party agrees to waive any requirement for the security or posting of any bond in connection with any action, claim or proceeding seeking specific performance of, or to enjoin the violation of, such covenants, and (v) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2     <u>Expenses</u>**. Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (<u>i.e.</u>, the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.3     <u>Entire Agreement</u>**. This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to

49

the subject matter hereof, except for the Confidentiality Agreement (as modified pursuant to Section 5.6(c)).

Section 9.4    **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, and the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

Section 9.7    **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

Furniture Factory Ultimate Holding, L.P.
6500 Jenny Lind Road, Space A,

50

Fort Smith, AR 72908
Attn:  Don Roach, Chief Financial Officer
Email: droach@ffohome.com

with a copy to:

Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, DE 19801
Attention: Domenic E. Pacitti, Esquire
Email: dpacitti@klehr.com

If to Buyer, then to:

American Freight FFO, LLC
680 Sunbury Road
Delaware, Ohio 43015
Attention: William A. Powell, President and CEO
Email: WPowell@americanfreight.us

with copies (which shall not constitute notice) to:

Troutman Pepper Hamilton Sanders, LLP
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia 30308
Attention: Matthew R. Brooks
Email: matthew.brooks@troutman.com
Attention: David B. Stratton
Email: david.stratton@troutman.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.7</u>.

    **Section 9.8**    <u>**Governing Law; Jurisdiction**</u>. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is

51

unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 9.9    Consent to Service of Process**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.9</u>.

**Section 9.10    WAIVERS OF JURY TRIAL**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11    Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12    No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13    No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for twenty (20) years following the Closing Date, and nothing in this <u>Section 9.13</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer, Buyer Group, that the agreements contained in this <u>Section 9.13</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for twenty (20) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 9.13</u>, none of the Parties would enter into this Agreement.

52

**Section 9.14**   **Non-Recourse**. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

**Section 9.15**   **No Right of Set-Off**. Buyer, on its own behalf and on behalf of Buyer Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer, any member of Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

**Section 9.16**   **Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.17**   **Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.18**   **Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.19** **Disclosure Schedule**. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered Sections corresponding to the Sections of this Agreement and each Section of the Disclosure Schedule will deemed to be an exception to (or, as applicable, a disclosure for purposes of) (a) the representations and warranties (or covenants, as applicable) of the Sellers that are set forth in the corresponding section or subsection of this Agreement; and (b) other representations and warranties of Seller that are set forth in the Agreement only to the extent that it is reasonably apparent on the face of such disclosure that it is an exception to (or, as applicable, a disclosure for purposes of) such representation or warranty. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 9.20** **Headings; Table of Contents**. The Section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.21** **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.22** **Time of Essence**. Time is of the essence of this Agreement.

[SIGNATURE PAGES FOLLOW]

## SIGNATURE PAGE TO
## ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.**

By _____
Name:
Title:

**FURNITURE FACTORY INTERMEDIATE HOLDING, LLC**

By _____
Name:
Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
Name:
Title:

**BEDDING HOLDING, LLC**

By _____
Name:
Title:

**BEDDING, LLC**

By _____
Name:
Title:

**BEDDING INTERMEDIATE HOLDING, LLC**

By _____
Name:
Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
Name:
Title:

**FURNITURE FACTORY OUTLET TRANSPORTATION, INC.,**

By _____
Name:
Title:

**BUYER:**

**AMERICAN FREIGHT FFO, LLC**

By _____
Name:
Title:

## SIGNATURE PAGE TO
## ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.**

By _____
    Name:
    Title:

**FURNITURE FACTORY INTERMEDIATE HOLDING, LLC**

By _____
    Name:
    Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
    Name:
    Title:

**BEDDING HOLDING, LLC**

By _____
    Name:
    Title:

**BEDDING, LLC**

By _____
    Name:
    Title:

**BEDDING INTERMEDIATE HOLDING, LLC**

By _____
    Name:
    Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
    Name:
    Title:

**FURNITURE FACTORY OUTLET TRANSPORTATION, INC.,**

By _____
    Name:
    Title:

**BUYER:**

**AMERICAN FREIGHT FFO, LLC**

By    */s/ William A. Powell*
    Name: William A. Powell
    Title: President and CEO

## SCHEDULE I

### Schedule of Additional Seller Entities

1.  Furniture Factory Holding, LLC, a Delaware limited liability company

2.  Bedding Holding, LLC, a Delaware limited liability company

3.  Furniture Factory Intermediate Holding, LLC, a Delaware limited liability company

4.  Bedding Intermediate Holding, LLC, a Delaware limited liability company

5.  Furniture Factory Outlet, LLC, a Delaware limited liability company

6.  Bedding, LLC, a Delaware limited liability company

7.  Furniture Factory Outlet Transportation, Inc., an Arkansas corporation

PHIL1 9186278v.4
110880660v14

**EXHIBIT A**

**Form of Bill of Sale**

See attached.

PHIL1 9186278v.4
110880660v14

## BILL OF SALE

This Bill of Sale, dated as of [       ], 2020 (this "Bill of Sale"), is made and entered into by and among **FURNITURE FACTORY ULTIMATE HOLDING, L.P.**, a Delaware limited partnership ("FFU Holding"), each of the Seller Subsidiaries (together with FFU Holding, "Sellers"), and American Freight FFO, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of November 4, 2020 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens).

2.    From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.    This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.    No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      EXCEPT AS AND TO THE EXTENT PROVIDED IN THE ASSET PURCHASE AGREEMENT, SELLERS EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ORAL OR WRITTEN, AND WHETHER GIVEN OR MADE OR DEEMED TO HAVE BEEN GIVEN OR MADE AT ANY TIME OR TIMES IN THE PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING THE NATURE OR CONDITION OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES AS TO THE MERCHANTABILITY OF THE PURCHASED ASSETS OR THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR FOR ANY PURPOSE.

8.      This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**<u>SELLERS</u>:**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.**

By _____
      Name:
      Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY INTERMEDIATE HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING INTERMEDIATE HOLDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY OUTLET TRANSPORTATION, INC.,**

By _____
      Name:
      Title:

**<u>BUYER</u>:**

**AMERICAN FREIGHT FFO, LLC**

By _____
      Name:
      Title:

**EXHIBIT B**

**Form of Assignment and Assumption Agreement**

See attached.

PHIL1 9186278v.4
110880660v14

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 2020 (this "Agreement"), is made and entered into by and among **FURNITURE FACTORY ULTIMATE HOLDING, L.P.**, a Delaware limited partnership ("FFU Holding"), each of the Seller Subsidiaries (together with FFU Holding, "Sellers"), and American Freight FFO, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of November 4, 2020 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.    From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3.    This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.    No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement.  To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

2

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.**

By _____
     Name:
     Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
     Name:
     Title:

**BEDDING, LLC**

By _____
     Name:
     Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
     Name:
     Title:

**FURNITURE FACTORY INTERMEDIATE HOLDING, LLC**

By _____
     Name:
     Title:

**BEDDING HOLDING, LLC**

By _____
     Name:
     Title:

**BEDDING INTERMEDIATE HOLDING, LLC**

By _____
     Name:
     Title:

**FURNITURE FACTORY OUTLET TRANSPORTATION, INC.,**

By _____
     Name:
     Title:

**BUYER:**

**AMERICAN FREIGHT FFO, LLC**

By _____
     Name:
     Title:

**EXHIBIT C**

**Form of Trademark Assignment Agreement**

See attached.

C-1

# TRADEMARK ASSIGNMENT AGREEMENT

This Trademark Assignment Agreement ("Assignment"), dated as of [_____], 2020, is made and entered into by and among **FURNITURE FACTORY ULTIMATE HOLDING, L.P.**, a Delaware limited partnership ("FFU Holding"), each of the Seller Subsidiaries (together with FFU Holding, "Sellers"), and American Freight FFO, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of November 4, 2020 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, Sellers' rights and benefits with respect to all trademarks and trademark applications owned by Sellers, each of which are set forth on Exhibit A attached hereto (collectively, the "Marks"), free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer, assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Marks.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

9.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Marks, together with the goodwill of the business symbolized by the Marks, the right to sue for past infringement of such Marks and the registrations thereof free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs the United States Patent and Trademark Office, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the Marks.

10.     From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

11.     This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

12.     No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective

successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

13.     None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

14.     This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

15.     This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

16.     This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.**

By _____
      Name:
      Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY INTERMEDIATE HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING INTERMEDIATE HOLDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY OUTLET TRANSPORTATION, INC.,**

By _____
      Name:
      Title:

**BUYER:**

**AMERICAN FREIGHT FFO, LLC**

By _____
      Name:
      Title:

**Exhibit A to Trademark Assignment Agreement**

**MARKS**

**EXHIBIT D**

**Form of Domain Name Assignment Agreement**

See attached.

## DOMAIN NAME ASSIGNMENT AGREEMENT

This Domain Name Assignment Agreement ("Assignment"), dated as of [_____], 2020, is made and entered into by and among **FURNITURE FACTORY ULTIMATE HOLDING, L.P.**, a Delaware limited partnership ("FFU Holding"), each of the Seller Subsidiaries (together with FFU Holdings, "Sellers"), and American Freight FFO, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of November 4, 2020 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, Sellers' rights and benefits with respect to all domain names (including all sub-domain names and extensions thereof and thereto) owned by Sellers, each of which are set forth on Exhibit A attached hereto (collectively, the "Domain Names"), free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Domain Names.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

17.     Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Domain Names, free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs any and all registrars thereof to transfer the Domain Names to Buyer.

18.     From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

19.     This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

20.     No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and

agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

21.    None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

22.    This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

23.    This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

24.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**FURNITURE FACTORY ULTIMATE HOLDING, L.P.**

By _____
      Name:
      Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY HOLDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY INTERMEDIATE HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING HOLDING, LLC**

By _____
      Name:
      Title:

**BEDDING INTERMEDIATE HOLDING, LLC**

By _____
      Name:
      Title:

**FURNITURE FACTORY OUTLET TRANSPORTATION, INC.,**

By _____
      Name:
      Title:

**BUYER:**

**AMERICAN FREIGHT FFO, LLC**

By _____
      Name:
      Title:

**<u>Exhibit A to Domain Name Assignment Agreement</u>**

**DOMAIN NAMES**

PHIL1 9186278v.4
110880660v14

**EXHIBIT E**

**Form of Sale Procedures Order**

See attached.

**EXHIBIT F**

**<u>Form of Sale Order</u>**

See attached.