**EXHIBT A**

**DIP Term Sheet**

**TERMS FOR FIRST LIEN SECURED SUPER-PRIORITY DEBTOR IN POSSESSION
FINANCING FOR FURNITURE FACTORY OUTLET, LLC AND BEDDING, LLC**

This term sheet (this "**Term Sheet**") sets forth the terms and conditions upon which the DIP Lender (as defined below) shall establish the DIP Facility (as defined below) in favor of the Borrowers (as defined below).

## Parties

| | |
|---|---|
| **Borrower:** | Furniture Factory Outlet, LLC, a Delaware limited liability company ("**FFO**") and Bedding, LLC, a Delaware limited liability ("**Bedding**", together with FFO, collectively, the **"Borrowers"**). |
| **Guarantors:** | Each of the Guarantors under the Pre-Petition Credit Agreement (as defined below)[1] (together with the Borrowers, the "**Debtors**"). |
| | For the avoidance of doubt, each guarantor hereby affirms its guaranty as set forth in Article IV of the Pre-Petition Credit Agreement. |
| | Each Guarantor hereby jointly and severally unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all obligations of the Borrowers now or hereafter existing hereunder and under any related document, whether for principal, interest, fees, expenses or otherwise (such obligations, to the extent not paid by the Borrowers, being the "**Guaranteed Obligations**"), and agrees to pay any and all expenses (including counsel fees and expenses) incurred by the DIP Lender in enforcing any rights under the guaranty set forth herein. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the DIP Lender but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Borrowers or any Guarantor. |
| | Notwithstanding the foregoing, recourse against Guarantor Furniture Factory Ultimate Holdings, LP ("**Ultimate Holdings**") for the Guaranteed Obligations shall be limited to Ultimate Holdings' assets and Ultimate Holdings' general partner, Sun Holdings VI, LLC (the "**GP**") shall, notwithstanding anything to the contrary under |

---

[1] Such Guarantors include (i) Furniture Factory Outlet, LLC, a Delaware limited liability company, (ii) Bedding, LLC, a Delaware limited liability company, (iii) Furniture Factory Ultimate Holding, LP, a Delaware limited partnership, (iv) Furniture Factory Holding, LLC, a Delaware limited liability company, (v) Furniture Factory Intermediate Holding, LLC, a Delaware limited liability company, (vi) Furniture Factory Outlet Transportation, Inc., an Arkansas corporation, (vii) Bedding Holding, LLC, a Delaware limited liability company, and (viii) Bedding Intermediate Holding, LLC, a Delaware limited liability company.

applicable Delaware law or otherwise, have no liability for any Guaranteed Obligations, including any obligation guaranteed by Ultimate Holdings.

American Freight hereby agrees that it shall not sell, transfer, assign, convey or grant participations in any of its rights, title or interest in (including proceeds thereof), to and under any Ultimate Holdings' prepetition or post-petition guaranty or other obligation (a "**Transfer**") to any Prohibited Assignee. Any Transfer in violation of the foregoing shall be null and void ab initio.

Ultimate Holdings' prepetition and post-petition guarantees (the "**Holdings Guarantees**") shall terminate, and any and all GP obligations relating thereto shall be deemed released and discharged immediately upon the consummation of any Credit Bid by the DIP Lender or any other transaction that results in American Freight or any other person that owns, holds, or otherwise controls an interest under the Pre-Petition Credit Agreement gaining direct or indirect control of Ultimate Holdings' or any of its direct or subsidiaries or a material portion of the assets of Ultimate Holdings' or any of its direct or indirect subsidiaries.

If, prior to the Closing, American Freight seeks to Transfer all or a portion of its rights against Ultimate Holdings under the Holdings Guarantees to a transferee in a Transfer that is expressly permitted hereunder, such Transfer shall be null and void and of no force and effect, unless and until the transferee agrees in writing to be bound by this Term Sheet.

| | |
|---|---|
| **DIP Lender:** | American Freight FFO, LLC ("**American Freight**" or the "**DIP Lender**"). |

<u>Terms</u>

| | |
|---|---|
| **Amount and Type of Facility:** | The DIP Lender shall make available to the Borrowers a super-priority, secured, debtor-in-possession credit facility (the "**DIP Facility**") consisting of a multi-draw term loan facility in the aggregate principal amount of up to $6,540,000.00 (the "**DIP Loans**"). Once repaid, amounts under the DIP Facility may not be reborrowed. |

Advances under the DIP Facility shall be subject to (i) the conditions precedent to advances under Sections 5.02(a), (b) and (c) of the Pre-Petition Credit Agreement (and shall include, without limitation, a condition that no Default or Event of Default has occurred and is continuing under the DIP Loan Documents (as defined below)), and

2

(ii) satisfaction of the conditions precedent herein.

The DIP Facility will be subject to the terms and conditions of this Term Sheet, certain provisions of the Pre-Petition Credit Agreement referred to herein, the Interim Order, the Final Order and all other security documents, guarantees and other legal documentation entered into in connection with the DIP Facility and/or the Pre-Petition Credit Agreement (including, without limitation, all Loan Documents (as defined in the Pre-Petition Credit Agreement), each solely as referred to and modified and supplemented by this Term Sheet, the Interim Order, and the Final Order (collectively, together with this Term Sheet, the Pre-Petition Credit Agreement, and any Definitive Credit Agreement (as defined below), the "**DIP Loan Documents**"). The relevant sections of Pre-Petition Credit Agreement are incorporated herein by reference, as applicable.

Upon the request of the DIP Lender, the Debtors shall enter into a definitive credit agreement incorporating the terms of this Term Sheet and otherwise consistent with the Pre-Petition Credit Agreement (a "**Definitive DIP Credit Agreement**"), along with such other loan documents as the DIP Lender shall request.

Without limiting the foregoing, the DIP Facility shall be subject to the entry in the Bankruptcy Court of the Interim Order, in form and substance acceptable to the DIP Lender in its sole and absolute discretion.

| | |
|---|---|
| **Non-Default Interest Rate and Payment Terms:** | Interest on all outstanding advances under the DIP Facility shall accrue from and after the date of such advance at a **per annum floating rate** equal to LIBOR+7.00% (the "**Non-Default Interest Rate**"), subject to a LIBOR floor of 0.00%; provided, that if LIBOR ceases to be published on a regular basis or to be used as a prevailing market reference rate for commercial loans, each as determined by the DIP Lender prior to payment in full of the obligations under the DIP Facility, the DIP Lender shall in its discretion select an alternate reference rate giving due regard to market practices with respect to commercial loans.   All accrued and unpaid interest, and the origination fee, shall be payable by the Borrowers to the DIP Lender in the periods set forth in the Budget.  All computations of interest payable hereunder shall be on the basis of a three hundred sixty (360)-day year consisting of twelve (12) thirty (30)-day months and actual days elapsed in the period of which such interest is payable. |

For the avoidance of doubt, the interest payment dates for interest under the DIP Facility shall be the same as the Pre-Petition Credit

Agreement.

**Default Interest Rate:**     Effective immediately upon the occurrence of the Termination Date and the failure by the Debtors to pay in full to the DIP Lender all amounts owing under the DIP Facility within one (1) business day (as defined below) of the occurrence thereof, interest on all amounts outstanding under the DIP Facility shall accrue at a rate that is 2% per annum in excess of the Non-Default Interest Rate (the "**Default Interest Rate**"), unless waived in writing by the DIP Lender in its sole discretion.

**Loan Payments:**     All unpaid principal, accrued interest, fees, costs and expenses arising under or relating to the DIP Facility shall be due and payable in full by the Borrowers on the Termination Date, whether occurring by maturity, upon acceleration or otherwise.

**Draw Schedule:**     All advances under the DIP Facility shall be limited to the following amounts during the following periods, unless the Termination Date (as defined below) shall have occurred before any such date:

    a.   upon entry of the Interim Order: $1,750,000.00;

    b.   from November 16, 2020 through and including November 29, 2020: $1,600,000.00;

    c.   from November 30, 2020 through and including December 13, 2020: $1,600,000.00; and

    d.   from December 14, 2020 through and including December 30, 2020: $1,590,000.00 (a. through d., collectively, the **"Draw Schedule"**).

The Draw Schedule may be further modified and amended from time to time only with the prior written consent of the DIP Lender and the Borrowers. Except for an initial advance which may be requested upon closing, to request an advance under the DIP Facility, Borrowers shall submit to the DIP Lender not less than one (1) business day prior to the date of such advance a borrowing request in form and substance satisfactory to the DIP Lender (which may be, in the sole discretion of the DIP Lender, substantially in the form of an exhibit attached to the Pre-Petition Credit Agreement). Advances shall be in an amount not less than $250,000 and in increments of $250,000, and all advances shall be made by wire transfer of immediately available funds. The DIP Lender shall have no obligation to make an advance hereunder if a Default or Event of Default then exists under the DIP Facility.

To the extent the amount of Borrowers' aggregate borrowings under

4

the DIP Facility exceed the amount of Debtors' operational expenses paid prior to the date of consummation of the transactions contemplated by the Asset Purchase Agreement (as defined below) and were accrued or incurred prior to such date, consistent with the categories and the amounts as set forth in the Budget and Permitted Budget Variances (as defined below), any such excess funds that exceed the amount of such accrued or incurred operating expenses shall not become, or deemed to be, property of the Debtors' bankruptcy estate and shall be returned to the DIP Lender within forty-five (45) days after the Closing Date.

**Closing Date:**

Subject to the entry of the Interim Order and the other conditions precedent set forth herein, on or before November 6, 2020, or such later date as may be mutually agreed upon by the Debtors and the DIP Lender (the "**Closing Date**").

**Credit Bid:**

Subject to Section 363(k) of the Bankruptcy Code, the Pre-Petition Agent and Pre-Petition Lenders and the DIP Lender or their respective designees shall have the right to credit bid up to the full amount of their respective obligations in any sale of the Debtors' assets, without the need for further Court order authorizing the same, and whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise. Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle.

**Budget and Variances:**

Subject to the Permitted Budget Variances (i) the Debtors' actual total cash receipts and cash disbursements from operations (excluding fees and expenses of third party professionals engaged by or for the benefit of the Debtors or the DIP Lender (collectively, "**Professional Fees**")) shall each be adhered to on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending as described below and (ii) the Debtors' disbursements for Professional Fees (which shall be reported in a manner so that Professional Fees for each retained professional shall be reflected on its own line item) shall be adhered to on a cumulative basis for that portion of the Budget period then ending even if actual payment of the same shall not be made until thereafter in accordance with the filing of fee applications (and their approval by the Bankruptcy Court (as defined below)), except as to the DIP Lender's Professional Fees payable pursuant to the "Professional Fees and Expenses" section of this Term Sheet (which shall the DIP Lender Professional Fees shall not be limited by the Budget). The DIP Lender also agrees that all such Professional Fees are being paid from its collateral, and thus, such payments shall still be made notwithstanding the conversion or

5

dismissal of such bankruptcy cases.

Actual amounts for total cash receipts and cash disbursements from operations line items (which shall not and does not include any Professional Fees) may not vary from the applicable Budget by (i) more than fifteen percent (15%) for cash receipts on a trailing two (2) week basis; (ii) more than ten percent (10%) for cash disbursements on a trailing two (2) week basis; or (iii) five percent (5%) on a cumulative basis for that portion of the Budget period then ended (collectively, the "**Permitted Budget Variances**"). Permitted Budget Variances are not cumulative beyond a rolling two-week basis; provided, however, that in the event the Debtors experience material supply chain disruptions due to the commencement of the Chapter 11 cases that results in actual amounts for total cash receipts and cash disbursements for COGS to be outside of the Permitted Budget Variances, the parties hereto agree to negotiate in good faith to discuss any appropriate modification to the Budget and Permitted Budget Variances that may be necessary until such time as the Debtors' operations and inventory levels normalize; provided further, however, that it expressly understood and agreed that the DIP Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances.

**DIP Obligations**:

As used herein, the term "DIP Obligations" means (a) the due and punctual payment by the Debtors of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the commencement of the Chapter 11 Cases) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses, attorney's fees and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the Debtors to the DIP Lender under this Term Sheet, the Financing Orders and related documentation, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under or pursuant to this Term Sheet, the Financing Orders and related documentation.

**Fees:**

The Borrowers shall pay the following fees and/or expenses to the DIP Lender under the DIP Facility, in each case, without setoff or counterclaim:

   a.  an origination fee equal to one percent (1.00%) of the maximum principal amount of the DIP Facility, which origination fee shall be fully-earned upon entry of the Interim

Order and shall be payable as set forth in the Budget;

b.  the costs and expenses (including, without limitation, attorneys' fees and expenses) of the DIP Lender as set forth in the Section titled "Professional Fees and Expenses," below; and

c.  a termination fee of $200,000, due and payable to the DIP Lender if the Debtors seek and obtain post-petition financing from any Person other than the DIP Lender.

**Termination Date:**   The earliest to occur of:

a.  the date that is ninety (90) days after the Petition Date, or such later date to which the DIP Lender shall consent in writing (the "**Maturity Date**");

b.  three (3) business days after the Petition Date (as defined below) if the Interim Order has not been entered;

c.  twenty-five (25) days after the Petition Date if the Final Order has not been entered;

d.  at the election of the DIP Lender following the occurrence and continuance of any Event of Default (defined below) beyond the expiration of any applicable cure or grace period;

e.  the failure of the Debtors to comply with the terms and conditions of the DIP Facility, including, without limitation, the obligations set forth in the "Sale Process" section of this Term Sheet;

f.  the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full of all DIP Obligations or is otherwise acceptable to the DIP Lender in its sole discretion;

g.  the date which is the closing date of any sale of all or substantially all of the Debtors' assets;

h.  the entry of an order by the Bankruptcy Court (1) granting relief from the automatic stay permitting foreclosure on any assets of the Debtors with a value in excess of $100,000 in the aggregate, (2) appointing a trustee or an examiner with special powers, or (3) dismissing or converting the Chapter 11 Cases (as defined below); and

i.  the filing or support by the Debtors of a plan of

7

reorganization or liquidation that (1) does not provide for indefeasible payment in full of all obligations owing under the DIP Facility and the Pre-Petition Credit Agreement and other definitive loan documents and (2) is not otherwise acceptable to the DIP Lender in its sole discretion.

The date on which the earliest of clauses a. through i. above occurs being referred to hereinafter as the "**Termination Date**." The DIP Lender agrees to provide notice of the occurrence of the Termination Date to the Debtors as promptly as practicable thereafter.

On and after the occurrence of the Termination Date, the DIP Lender is hereby authorized and to take any or all of the following actions without further notice (except the Termination Notice (as defined below)), motion or application to, order of or hearing before, the Bankruptcy Court:

i.   cease making any DIP Loan advances to the Debtors;

ii.  terminate, reduce or restrict any commitment to extend credit to the Debtors under the DIP Facility;

iii. terminate the Debtors' rights under this Term Sheet or the Interim Order, if any, to use Cash Collateral, except to the extent such cash may be used for the Carve-Out (provided that nothing in this Term Sheet or the Interim Order shall limit the Debtors' ability to seek to use Cash Collateral on a non-consensual basis and/or challenge whether such a Termination Date has occurred);

iv.  declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors;

v.   freeze monies or balances in the Debtors' accounts except to the extent that such cash may be used for the Carve-Out;

vi.  (A) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations except to the extent that such cash may be used for the Carve-Out, (B) enforce all rights and remedies against the DIP Collateral in the possession of the DIP Lender for application towards the DIP Obligations and otherwise proceed to protect or enforce all rights and remedies of the DIP Lender under the DIP Loan Documents or applicable law, including, but not limited to, by suit in equity, action at

8

law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained herein (or any other DIP Loan Document) or any instrument pursuant to which the DIP Obligations are evidenced, and (C) if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the DIP Lender, except to the extent necessary for payment of the Carve-Out; and

vii. take any other actions or exercise any other rights or remedies permitted under this Term Sheet, the Interim Order or the Final Order, as applicable, the DIP Loan Documents, or applicable law to effectuate the repayment of the DIP Obligations;

provided, however, that, prior to the first exercise of any right or remedy described in clauses ii through vii above, the DIP Lender shall be required to provide to the Debtors (with a copy to their bankruptcy counsel), counsel to the Committee (if any), and the U.S. Trustee three (3) business days' prior written notice (the "**Remedies Notice Period**") of the DIP Lender's intention to enforce any such rights or remedies (the "**Termination Notice**").

| | |
|---|---|
| **Cash Collateral:** | Subject to the entry in the Bankruptcy Court of the Interim Order, the DIP Lender hereby consents to the use of its "cash collateral" as defined in section 363(a) of the Bankruptcy Code (and includes, without limitation, all of the respective cash proceeds of the DIP Collateral and pre-petition collateral in which the Pre-Petition Lender has an interest (including, without limitation, any adequate protection lien or security interest), whether such interest existed as of the Petition Date or arises thereafter pursuant to this Interim Order, any other order of the Bankruptcy Court (including, without limitation, the Final Order), applicable law, or otherwise, the "**Cash Collateral**"), all in accordance with the terms and conditions set forth in this Term Sheet, the Financing Orders, any related documentation and the Budget; provided that the DIP Loan Parties shall operate their cash management system in a manner that is the same or substantially similar to their pre-petition cash management system. |
| **Optional Prepayment:** | The DIP Facility may be prepaid (in accordance with the priorities herein) and the commitments under the DIP Facility may be terminated in whole at any time upon at least three (3) business days' prior written notice to DIP Lender; provided, however, if such prepayment is permanent and is accompanied by a termination of all |

9

commitments under the DIP Facility, Borrowers shall pay to DIP Lender the termination fee set forth herein.

**Mandatory Prepayments:**    Subject to the terms and conditions of the Financing Orders, the DIP Facility will be subject to the mandatory prepayment events under the Pre-Petition Credit Agreement, including, without limitation, prepayments from proceeds of non-ordinary course dispositions of DIP Collateral and the termination fee set forth herein, unless waived in writing by the DIP Lender; provided, however, that no mandatory prepayment will be required with the proceeds of any tax refund.

**Use of Proceeds:**    The Borrowers shall utilize the proceeds of the DIP Facility solely for the following purposes (and to the extent identified in the Budget):

    a.  after application of all other available cash, to fund post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930;

    b.  to pay interest, fees and expenses to the DIP Lender in accordance with this Term Sheet (whether or not such amounts are reflected in the Budget);

    c.  to fund fees and expenses incurred in connection with the Sale Transaction (as defined below) provided for in the Budget;

    d.  to pay permitted pre-petition claim payments;

    e.  to pay Professional Fees provided for in the Budget and the Interim Order; and

    f.  to pay certain other costs and expenses of administration of the Chapter 11 Cases.

For the avoidance of doubt, the Borrowers shall not utilize the proceeds of the DIP Facility or Cash Collateral for any of the following purposes:

    i.  to permit the Debtors, or any other party-in-interest or their representatives (including without limitation, the Committee, if any) to challenge or otherwise contest or institute any proceeding to determine (A) the validity, perfection, or priority any lien or security interest in favor of the DIP Lender, the Pre-Petition Lender, or their respective successors or predecessors in interest or (B) the validity,

10

enforceability or amount of any obligation of any of the Debtors under the Pre-Petition Credit Agreement or any other Loan Document;

ii.    to commence, prosecute, or defend any claim, motion, proceeding, or cause of action against the DIP Lender, the Pre-Petition Lender, or any of their respective affiliates, agents, attorneys, advisors, successors, predecessors in interest, or representatives (including, without limitation, any lender liability claims, subordination claims, or rights to credit bid);

iii.   to commence, prosecute, or defend any claim, motion, proceeding, or cause of action to determine, disallow or challenge the obligations of the Debtors under any of the Loan Documents, or the DIP Loan Documents (clauses **Error! Reference source not found.** through **Error! Reference source not found.**, each, a "**Challenge**"); or

iv.    to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the DIP Lender.

| | |
|---|---|
| **Cash Management Collections and Remittances:** | The Debtors shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Lender in its sole discretion. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable first-priority lien and security interest in the cash held in the Debtors' bank accounts. |
| **Pre-Petition Obligations:** | As of the date of this Term Sheet, the Borrowers owe certain obligations to the DIP Lender pursuant to that certain Credit Agreement dated as of June 10, 2016 by and among Furniture Factory Outlet, LLC and Bedding LLC as borrowers, certain other parties party thereto as loan parties, American Freight, as lender, and American Freight (as successor to Stellus Capital Investment Corporation), as agent thereunder (as amended, restated, supplemented, or otherwise modified from time to time (as amended, restated, amended and restated, or otherwise modified from time to time, including, without limitation, in that certain Seventh Amendment to Credit Agreement and Wavier dated July 6, 2020 the "**Pre-Petition Credit Agreement**") and the other definitive Loan Documents (as defined in the Pre-Petition Credit Agreement).<br><br>American Freight, in its capacity as lender under the Pre-Petition |

Credit Agreement, is herein referred to as the "**Pre-Petition Lender**."

American Freight, in its capacity as agent under the Pre-Petition Credit Agreement, is herein referred to as the "**Pre-Petition Agent**."

| | |
|---|---|
| **Super-Priority Administrative Claim:** | In accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), the DIP Obligations shall constitute senior administrative expense claims against each Debtor, with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Debtors or their estates, and any successor trustee or other representative of the Debtors' estates in the Chapter 11 Cases or in any subsequent proceeding or case under the Bankruptcy Code, subject to the Carve-Out. The foregoing super-priority claim in favor of the DIP Lender shall not be payable from any claims or causes of action arising under chapter 5 of the Bankruptcy Code (except to the extent arising under 11 U.S.C. § 549) or any applicable state fraudulent transfer statutes (together, "**Avoidance Actions**") or any proceeds thereof. |
| | Subject to payment of the Carve-Out and to the super-priority claim in favor of the DIP Lender, all obligations subject to the Pre-Petition Lender Adequate Protection Liens (as defined below) shall have priority in payment over all other administrative expenses of the estate, to the extent of the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Pre-Petition Lender's and the Pre-Petition Agent's respective interest in their pre-petition collateral resulting from the DIP Facility, the DIP Liens, the imposition of the automatic stay or the sale, use, lease or disposition of such pre-petition collateral during the Chapter 11 Cases. |
| **Collateral Security:** | Upon the Petition Date, in order to secure the DIP Facility (including accrued interest, fees, costs and expenses), the Debtors hereby grant the DIP Lender a lien on and security interest in (the "**DIP Liens**") in all existing and after-acquired tangible and intangible personal and real property and assets of each of the Debtors, and their respective estates, wherever located, and any proceeds and products thereof, including, without limitation (collectively, and as follows, the "**DIP Collateral**"): (a) all pre-petition collateral and (b) all of such |

12

Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts and all cash contained therein, contract rights, and tax refunds of the Debtors, and all proceeds and products of all of the foregoing assets, whether tangible or intangible, whether coming into existence prior to the Petition Date or after the Petition Date; provided, however, the Interim Order does not grant, and shall not be deemed to grant, any security interests in or liens on claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, the "**Avoidance Actions**"), but proceeds of Avoidance Actions and property received thereby, whether by judgment, settlement or otherwise, shall, upon the entry of the Final Order granting such relief, constitute DIP Collateral (including, without limitation, proceeds from the disposition of real property leases or real property leasehold interests). For the avoidance of doubt, any proceeds from the use, sale, transfer, assignment or other disposition of any property not included in the definition of DIP Collateral shall be considered DIP Collateral (including, for the avoidance of doubt, any proceeds from the disposition of any real property leases or real property leasehold interests).

The DIP Liens shall be (i) subject and subordinate to any valid, perfected and unavoidable prior liens and security interests existing as of the Petition Date in favor of any third party creditor (other than the Pre-Petition Lender) and (ii) subject to the Carve Out, by first priority senior and priming liens and security interests. The DIP Collateral shall include, upon entry of the Final Order, Avoidance Actions and proceeds of Avoidance Actions.

For the avoidance of doubt, the DIP Liens shall include all property and assets of the Debtors, of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located; all property of the estate of the Debtors within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law, subject to entry of the Final Order); and all proceeds, rents and products of the foregoing, with the exception of certain assets as expressly provided in the DIP Facility (collectively, the "**Property**") as follows:

(a)   pursuant to section 364(c)(1) of the Bankruptcy Code,

allowed super-priority administrative expense claims in the Bankruptcy Case, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out; without limiting the source of payments in any way, the Debtors' Property and any proceeds thereof (subject only to the Carve-Out) may be utilized to satisfy the DIP Lender's super-priority claims;

(b)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, perfected, first-priority security interests in and liens on the Property that is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date (or to non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to Permitted Encumbrances (as defined in the DIP Loan Documents) and the Carve-Out;

(c)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid junior perfected security interests in and liens on all Property that is subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, or to non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, subject only to the Carve-Out; and

(d)    all DIP Liens shall be senior in priority to any security interests in or liens on the Property created or granted after the Petition Date.

| | |
|---|---|
| **Lien Validation and Perfection:** | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. |

The Debtors shall stipulate in the Interim Order and Final Order to the following:

a.    the Pre-Petition Lender's liens securing the Pre-Petition Credit Agreement are valid, perfected, encumber all assets of the Debtors, and have first priority; and

14

b.  the Debtors possess no claims, offsets or any other type of cause of action against the Pre-Petition Lender which would impair, in any manner, the Pre-Petition Lender's liens against the Debtors' assets, or the obligations of the Debtors to the Pre-Petition Lender under the Pre-Petition Credit Agreement.

The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Cases, including any Committee that is appointed, unless: (i) an adversary proceeding is filed (Y) by any party-in-interest prior to the expiration of seventy-five (75) days after the entry of the Interim Order or (Z) by any Committee, if formed, sixty (60) days after its formation (the **"Review Period"**) against the Pre-Petition Lender challenging the Pre-Petition Lender's liens or otherwise asserting estate claims against the Pre-Petition Lender; and (ii) a final, non-appealable judgment is entered against the Pre-Petition Lender in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Pre-Petition Lender on behalf of the Debtors' estates, or challenging in any manner the Pre-Petition Lender's liens and claims (as applicable) against the Debtors.

| | |
|---|---|
| **Release of Claims:** | In consideration of the furnishing of the DIP Facility, the Debtors, subject to the rights of another party to bring a Challenge during the Review Period, and upon entry of the Final Order, hereby absolutely release and forever discharge the DIP Lender and Pre-Petition Lender and Pre-Petition Agent, and each of their respective affiliates, predecessors in interest, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that the Debtors may hold against such released parties. |
| **506(c) Surcharge:** | Upon entry of the Final Order, subject to the Carve-Out, the Debtors hereby waive any right to surcharge the pre-petition collateral or DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law. |
| **Adequate Protection:** | As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Pre-Petition Lender (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve-Out and subject to the super-priority administrative claims of the DIP Lender under the DIP Facility and existing claims of the Pre-Petition Lender on their respective pre-petition collateral; and (b) shall have valid, binding, enforceable and perfected liens in all DIP Collateral, subject to |

15

payment of the Carve-Out, the DIP Liens, and any valid, perfected and unavoidable pre-petition liens, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective interest in their pre-petition collateral resulting from the DIP Facility, the DIP Liens, the imposition of the automatic stay or the sale, use, lease or disposition of such pre-petition collateral during the Chapter 11 Cases (the **"Pre-Petition Lender Adequate Protection Liens"**); and (c) shall be entitled to reimbursement from the Debtors and their estates for fees and costs as provided in the Professional Fees and Expenses paragraph below.

|  |  |
|---|---|
| **Professional Fees and Expenses:** | Subject to payment of the Carve-Out, the Debtors shall promptly pay or reimburse the DIP Lender, the Pre-Petition Lender and the Pre-Petition Agent when invoiced for all reasonable fees and expenses of their respective counsel (including, without limitation, local counsel) and financial advisors (i) in the case of professionals for the DIP Lender, relating to the DIP Facility, the negotiation, documentation, administration and interpretation of the DIP Facility, the Chapter 11 Cases, or the enforcement of remedies under the DIP Facility, and including all due-diligence (including but not limited to environmental due-diligence), duplication or printing costs, consultation, experts, travel, and preparation for and attendance at court hearings, regardless of whether the DIP Facility is consummated, and (ii) in the case of the professionals for the Pre-Petition Agent or the Pre-Petition Lender, relating to the Pre-Petition Credit Agreement or other Loan Documents (as defined in the Pre-Petition Credit Agreement) and the liens in connection therewith, the Interim Order or Final Order (including, without limitation, the negotiation, documentation, interpretation or enforcement of any such order), the Chapter 11 Cases, or the enforcement of any right or remedy under the Pre-Petition Credit Agreement or other Loan Documents, and including all duplication or printing costs, consultation, experts, travel, and preparation for and attendance at court hearings. Subject to payment of the Carve-Out, the DIP Lender shall have the right to charge the DIP Facility for any such fees and costs. Failure to pay such fees and expenses within ten (10) business days of delivery of the applicable invoice shall be a default under the DIP Facility, provided that the DIP Lender, Pre-Petition Lender and Pre-Petition Agent shall concurrently provide copies of any invoices to the U.S. Trustee and the Committee and allow such parties at least ten (10) days to review and object to any fees or expenses requested therein. If any objection is timely asserted, the Bankruptcy Court shall decide the issue and the Debtor shall not be required to pay any disputed portion of such fees or expenses until the matter is resolved but shall timely pay any undisputed portion of such fees and expenses. Notwithstanding anything to the contrary contained herein, to the extent such DIP Lender/Agent or Pre-Petition |

16

Lender/Agent Professional Fees for any weekly Budget period would result in the Debtors having insufficient funds to make other payments reflected in the Budget for that weekly period, payment or charging of such Professional Fees will be deferred to the next weekly period during which the Debtors have sufficient funds to pay such Professional Fees and all other payments reflected in the Budget for such weekly period, and such deferral shall not result in a default under the DIP Facility.

**Conditions Precedent:** The closing of the DIP Facility shall be subject to the satisfaction of each of the following conditions, in each case, in form and substance satisfactory to the DIP Lender in all respects:

    a.  the DIP Lender's approval of the Interim Budget (as defined below) and Budget, together with all financial information and projections regarding the Debtors requested by the DIP Lender, all in form and substance satisfactory to the DIP Lender in its sole discretion;

    b.  entry of the Interim Order (with respect to any advances set forth on the Draw Schedule made from and after the Interim Order, up to but not including the Final Order) and the Final Order (with respect to any advances set forth in the Draw Schedule for periods beginning on and after entry of the Final Order) approving the DIP Facility, its super-priority administrative claims and all first priority (subject only to the Carve-Out) and other liens securing the DIP Facility, and containing such other orders and findings as the DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default hereunder that, upon at least seven (7) days' notice to the Debtors, the United States Trustee, and any Committee, results in the DIP Lender exercising certain rights and remedies against the DIP Collateral, which Interim Order or Final Order, as applicable, shall not have been modified or amended without the prior written approval of the DIP Lender, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Lender in its sole discretion;

    c.  the DIP Lender's approval (in its sole discretion) of all material motions and orders filed in the Chapter 11 Cases requiring the expenditure of cash;

    d.  continuation of Debtor's present cash management system;

    e.  completion of the DIP Lender's due diligence, including with

respect to the Borrowers' beneficial ownership and PATRIOT Act compliance;

f.  the DIP Lender's satisfactory review of the Debtors' corporate documentation, resolutions, certificates of authority, certificates of good standing and other documents that evidence the Debtors and their representatives as empowered and authorized to enter into the DIP Facility;

g.  evidence of insurance in such amounts as shall be acceptable to the DIP Lender and insurance certificates and endorsements naming the DIP Lender as loss payee and additional insured, as applicable, on any existing policies;

h.  valid and enforceable execution of the DIP Facility Documents related to the DIP Facility in form and substance acceptable to the DIP Lender;

i.  all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of (i) the DIP Lender (including (and limited, in the case of counsel, to) all reasonable fees, costs, disbursements and expenses of the DIP Lender's outside counsel, Troutman Pepper Hamilton Sanders LLP, and one firm of local counsel engaged by the DIP Lender in connection with the Chapter 11 Cases) and (ii) any other professional advisors retained by the DIP Lender or its counsel, on or before the Closing Date, shall have been paid in full in cash, to the extent invoiced to the Borrowers no later than one (1) business day prior to the Closing Date;

j.  the DIP Lender shall have received the amount of the closing fee payable on the Closing Date;

k.  all material documentation relating to the DIP Facility shall be in form and substance satisfactory to the DIP Lender in its sole discretion and executed by the Debtors;

l.  the Debtors shall have entered into a definitive Asset Purchase Agreement in form and substance acceptable to the DIP Lender in its sole discretion with a stalking horse bidder acceptable to the DIP Lender in its sole discretion;

m.  there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of the DIP Lender, prohibits, restricts or imposes a materially adverse condition upon the Debtors, the DIP Facility or the exercise by the DIP Lender of its rights as a secured party

18

with respect to the DIP Collateral;

n.    other than the Chapter 11 Cases, or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) except as disclosed, if adversely determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the DIP Facility, the DIP Collateral or the transactions contemplated thereby;

o.    other than the Financing Orders, (i) all governmental and third party consents and approvals necessary in connection with the DIP Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the DIP Lender in its reasonable discretion) and shall remain in effect, and (ii) no law or regulation shall be applicable, in the reasonable judgment of the DIP Lender, that restrains, prevents or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated hereby;

p.    the DIP Lender, shall have a valid and perfected lien on and security interest in the DIP Collateral on the basis and with the priority set forth herein and in the Financing Orders;

q.    with respect to any borrowing under the DIP Facility after twenty five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order authorizing and approving the DIP Facility and the transactions contemplated thereby and hereby, including, without limitation, the granting of the super-priority status, security interests and liens, and the payment of certain fees, which Final Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender;

r.    there shall have occurred no event which has resulted in or could reasonably be expected to result in a Material Adverse Change; and

s.    such other conditions as the DIP Lender may request in its sole discretion.

**Representations and**    To induce the DIP Lender to enter into this Term Sheet and to make

19

**Warranties:**

advances under the DIP Facility, the Debtors represent, warrant and covenant to the DIP Lender that the following statements are true, correct and complete as of the Petition Date. References to the knowledge or awareness of the Debtors are deemed to include the actual knowledge of any officer or director of the Debtors after due inquiry.

The representations and warranties contained in the Pre-Petition Credit Agreement are incorporated herein by reference. The representations and warranties contained herein and in the other DIP Loan Documents shall be made as of (x) the date the Borrowers and the Guarantor execute this Term Sheet and (y) each date upon which DIP Loans are made under the DIP Facility.

The Debtors hereby represent and warrant that: (i) subject to the terms of the Interim Order and Final Order, each Debtor has the full legal right, power and authority to enter into and perform its obligations under this Term Sheet, and the execution and delivery of this Term Sheet by each Debtor and the consummation by it of the transactions contemplated hereby and performance of its obligations hereunder have been duly authorized by all appropriate action (limited liability company or otherwise); and (ii) this Term Sheet and the other DIP Loan Documents constitute the valid, binding and enforceable obligations of the Debtors party thereto, enforceable against each such Debtor in accordance with the terms thereof, subject to the terms of the Interim Order and Final Order.

No representation or warranty of the Debtors contained in this Term Sheet or any other document, certificate or written statement furnished to the DIP Lender by or on behalf of any such Person for use in connection with the DIP Facility contains any untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.

The consummation of the transactions contemplated by this Term Sheet does not and will not violate or conflict with any laws, rules, regulations or orders of any Governmental Authority or violate, conflict with, result in a breach of, or constitute a default (with due notice or lapse of time or both) under any Contractual Obligation or organizational documents of the Debtors. Each of the Debtors are in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority and the obligations, conditions and covenants contained in all Contractual Obligations other than those laws, rules, regulations, orders and provisions of such Contractual Obligations the noncompliance with

20

which could not be reasonably expected to have, either individually or in the aggregate, a material adverse effect, and (ii) maintain all licenses, qualifications and permits necessary for the conduct of their respective businesses as presently conducted and expected to be conducted.

Notwithstanding the foregoing: (i) no Debtor: (A) is, or is controlled by or is acting on behalf of, a Restricted Party; (B) has received funds or other property from a Restricted Party;  or (C) is in breach of or, to such Debtor's knowledge, is the subject of any action or investigation under any Anti-Terrorism Law; (ii) the Debtors and each of their respective Subsidiaries has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws; (iii) the operations of the Debtors and their respective Subsidiaries are and have been conducted at all times in compliance with applicable Anti-Terrorism Laws and Money Laundering Laws and without violation of the Sanctions, and the Debtors and their respective Subsidiaries have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith; and (iv) neither the Debtors nor any of their respective Subsidiaries (or, to the knowledge of the Debtors, any director, officer, employee, agent, affiliate or representative of such Debtor or any of its Subsidiaries) is a Person currently the subject of any Sanctions, and neither the Debtors nor any of their respective Subsidiaries are located, organized or resident in a country or territory that is the subject of any Sanctions.  Each of the Debtors represents that it will not directly or indirectly use the proceeds of any DIP Loan  to fund any activities of or business with any Restricted Party or in any other manner that would result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of any Sanctions (as each such defined term used but not defined herein shall have the definition given to such term in the Pre-Petition Credit Agreement).

Each of the Debtors is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and qualified to do business in all states where such qualification is required except where failure to be so qualified could not reasonably be expected to have a material adverse effect.  The Debtors have all requisite organizational power and authority to own and operate their respective properties, to carry on their respective business as now conducted and proposed to be conducted, to enter into this Term Sheet and to incur the obligations under the DIP Facility, grant liens and security interests in the DIP Collateral and all property subject to Pre-Petition Lender Adequate Protection Liens, and carry out the transactions contemplated by this Term Sheet and the other DIP

21

Facility Documents.

This Term Sheet is, and the other DIP Facility Documents when executed and delivered will be, the legally valid and binding obligations of the applicable parties thereto, each enforceable against each of such parties, as applicable, in accordance with their respective terms.

The Budget, the Approved Budget Variance Report, and all other financial documents and reports concerning Borrower and Guarantor which have been or will hereafter be furnished to the DIP Lender hereunder have been or will be prepared in accordance with GAAP consistently applied (except as disclosed therein) and do or will present fairly in all material respects the financial condition of the entities covered thereby as at the dates thereof and the results of their operations for the periods then ended.

No part of the proceeds of the DIP Facility will be used for "buying" or "carrying" "margin stock" within the respective meanings of such terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect or for any other purpose that violates the provisions of the regulations of the Board of Governors of the Federal Reserve System. If requested by the DIP Lender, the Debtors will furnish to DIP Lender a statement to the foregoing effect in conformity with the requirements of FR Form G 3 or FR Form 01, as applicable, referred to in Regulation U.

The Debtors shall utilize the proceeds of the DIP Facility solely for the financing of the Debtors' working capital needs during the Chapter 11 Cases in accordance with the Budget.

The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Final Order has been given as identified in the Certificate of Service filed with the Bankruptcy Court.

The DIP Facility Documents shall include such other representations and warranties as are customary for similar financing transactions, in the sole discretion of the DIP Lender.

**Affirmative Covenants:**    The affirmative covenants contained in the Pre-Petition Credit Agreement are hereby incorporated herein by reference. Additionally, each Debtor covenants and agrees that from and after

110906611
PHIL1 9198608v.2

the date hereof and until the Termination Date:

1.  The Debtors will (a) comply with (i) the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including, without limitation, laws, rules, regulations and orders relating to taxes, employer and employee contributions, securities, employee retirement and welfare benefits, environmental protection matters and employee health and safety) as now in effect and which may be imposed in the future in all jurisdictions in which the Debtors are now doing business or may hereafter be doing business and (ii) the obligations, covenants and conditions contained in all Contractual Obligations of the Debtors other than those laws, rules, regulations, orders and provisions of such Contractual Obligations the noncompliance with which could not be reasonably expected to have, either individually or in the aggregate, a material adverse effect, and (b) maintain or obtain all licenses, qualifications and permits now held or hereafter required to be held by Debtors, for which the loss, suspension, revocation or failure to obtain or renew, could reasonably be expected to have, either individually or in the aggregate, a material adverse effect.

2.  The Debtors will maintain or cause to be maintained in good repair, working order and condition all material properties used in the business of the Debtors and will make or cause to be made all appropriate repairs, renewals and replacements thereof, ordinary wear and tear excepted.  The Debtors will maintain or cause to be maintained, with financially sound and reputable insurers, public liability and property damage insurance with respect to its business and properties against loss or damage of the kinds customarily carried or maintained by corporations of established reputation engaged in similar businesses and in amounts reasonably acceptable to the DIP Lender and will deliver evidence thereof to the DIP Lender.  The Debtors will maintain business interruption insurance providing coverage until April 30, 2021.  The Debtors represent and warrant that the and each of their respective Subsidiaries currently maintains all material properties as set forth above and maintains all insurance described above.  In the event the Borrowers fail to provide the DIP Lender with evidence of the insurance coverage required by this Agreement, the DIP Lender may purchase insurance at the Borrowers' expense to protect the DIP Lender's interests in the DIP Collateral.  This insurance may, but need not, protect the Borrowers' interests.  The coverage purchased by the DIP Lender may not pay any claim made by Borrower or any claim that is made against the Borrowers in connection with the DIP Collateral.  The Borrowers may, and the DIP Lender shall at the written request of the Borrowers, later cancel any insurance purchased by the DIP Lender, but only after providing the DIP Lender with evidence that the

23

Borrowers have obtained insurance as required by this Agreement. If the DIP Lender purchases insurance for the DIP Collateral, the Borrowers will be responsible for the costs of that insurance, including interest and other charges imposed by the DIP Lender in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance the Borrowers are able to obtain on its own.

3. The Debtors shall permit any authorized representatives of DIP Lender to visit, audit and inspect any of Debtors' properties, including its and their financial and accounting records, and to make copies and take extracts therefrom, and to discuss its and their affairs, finances and business with its and their officers and certified public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested.

4. The Debtors will at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to their respective business.

5. Promptly after the same is available, the Debtors shall furnish or cause to be furnished to counsel for the DIP Lender all pleadings, motions, applications, judicial information, financial information and other documents filed by the Debtors with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases or distributed by or on behalf of the Debtors to any Committee, and without limiting the generality of the foregoing, the Debtors shall promptly deliver to, and discuss with the DIP Lender and its counsel any and all information and developments in connection with any proposed Sale, subject to the terms and conditions set forth in the sale procedures with respect to the sale process and the Sale Order, and any other event or condition which is reasonably likely to have a material effect on the Debtors or the Chapter 11 Cases, including, without limitation, the progress of any disclosure statement or any proposed Chapter 11 plan of reorganization.

6. The Debtors shall strictly and timely comply with the Milestones (as defined below).

7. Contemporaneously with closing a sale of substantially of all of its assets, the Debtors shall remit an amount equal to the net proceeds of such sale, in cash, to the DIP Lender for immediate application to the obligations owed to the DIP Lender and the Pre-Petition Lender, subject to payment of the Carve-Out.

8. Each Debtor shall maintain a cash management system as in effect on the Petition Date.

9. Each Debtor shall, and shall cause its officers, directors, employees and any non-employee serving a Debtor in a management capacity to, cooperate fully with the DIP Lender and its designees and advisors in furnishing information as and when reasonably requested by the DIP Lender or any such designees or advisors regarding the DIP Collateral or any Debtor's financial affairs, finances and financial condition, business and operations. Upon reasonable prior notice and at reasonable times, each Debtor authorizes the DIP Lender and its designees and advisors to meet and/or have discussions with any of its officers, managers, members, directors and employees and any such non-employees from time to time as reasonably requested by the DIP Lender or any such designees or advisors to discuss any matters regarding the DIP Collateral or any Debtor's financial affairs, finances, financial condition, business and operations, and shall direct and authorize all such persons and entities to fully disclose to the DIP Lender and such designees or advisors all information reasonably requested by the DIP Lender or its designees or advisors regarding the foregoing. Each Debtor waives and releases any such officer, manager, member, director, employee and non-employee from the operation and provisions of any confidentiality agreement that any Debtor has with a third party entered into prior to the date hereof which would preclude any of the activities specified in this paragraph.

10. On the secondt business day of each week, Debtors shall deliver to the DIP Lender Borrowers' actual weekly and two-week cumulative cash flow results from the week ending on the Friday immediately preceding such first business day, together with an Approved Budget Variance Report for such week and cumulative two-week period.

11. Debtors shall adhere to the Budget, subject to Permitted Budget Variances. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender.

12. Subject to payment of the Carve-Out, the DIP Liens shall: (a) constitute first-priority security interests in and liens upon all DIP Collateral that is not otherwise subject to any valid, perfected, enforceable and non-avoidable lien in existence as of the Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code; and (b) pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, be senior to and prime all other liens and security interests in the DIP Collateral, including, without limitation, the 1L Pre-Petition

Liens (as defined in the Interim Order), the Pre-Petition Lender Adequate Protection Liens, and any lien that is avoidable, or may hereafter be avoided, pursuant to any Avoidance Action; provided however, that the DIP Liens shall be junior only to any Prior Liens, but solely to the extent such Prior Liens are valid, binding, enforceable, perfected and non-avoidable.

13.   The DIP Liens and Pre-Petition Lender Adequate Protection Liens shall not be subject to a Challenge, and the DIP Liens and Pre-Petition Lender Adequate Protection Liens shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Lender or the Pre-Petition Lender, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  If the DIP Lender or Pre-Petition Lender hereafter requests that the Debtors execute and deliver financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Lender or Pre-Petition Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Pre-Petition Lender Adequate Protection Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents and to pay all fees, taxes, and other governmental charges required to be paid as a result of or as a condition to recording or filing any such agreements, financing statements, instruments and other documents, and the DIP Lender and the Pre-Petition Lender are hereby authorized (but not obligated) to file or record such documents without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  The DIP Lender and/or the Pre-Petition Lender may file a photocopy of the Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

**Negative Covenants:**   The negative covenants contained in the Pre-Petition Credit Agreement are hereby incorporated herein by reference, other than (i) Section 8.01 (Liens) to the extent that it would prohibit the DIP Liens hereunder, (ii) Section 8.03 (Indebtedness) to the extent that it

26

would prohibit the DIP Loans hereunder and (iii) and Section 8.11 (Financial Covenants), which shall no longer apply. Additionally, each Debtor covenants and agrees that from and after the date hereof until the Termination Date:

1.    The Debtors shall not directly or indirectly to create, incur, assume, or otherwise become or remain directly or indirectly liable with respect to any indebtedness or make any payments to any Person other than as set forth on the Budget or the Approved Budget Variance Report.

2.    The Debtors shall not directly or indirectly create, incur, assume or permit to exist any lien on or with respect to any of the Debtors' property or assets, whether now owned or hereafter acquired, or any income or profits therefrom, except in favor of DIP Lender and Pre-Petition Lender.

3.    The Debtors shall not directly or indirectly make or own any investments except as permitted by the Bankruptcy Court.

4.    The Debtors shall not directly or indirectly convey, sell, lease, sublease, transfer or otherwise dispose of, or grant any Person an option to acquire, in one transaction or a series of related transactions, any of its property, business or assets, whether now owned or hereafter acquired, except as set forth in the Sale Order.

5.    The Debtors shall not establish any new bank accounts, without prior written notice to the DIP Lender and unless the DIP Lender and the bank at which the account is to be opened enter into a control agreement pursuant to which such bank (a) acknowledges the security interest of the DIP Lender in such bank account, (b) agrees to comply with instructions originated by the DIP Lender directing disposition of the funds in the bank account without further consent from the Debtors, and (c) agrees to subordinate and limit any security interest the bank may have in the bank account on terms satisfactory to the DIP Lender.

6.    Debtors shall not allow Permitted Budget Variances under the Approved Budget to be exceeded.

7.    Without the prior written consent of the DIP Lender, Debtors shall not make or permit to be made any change to the Orders or any other order of the Bankruptcy Court with respect to the DIP Facility.

8.    Debtors shall not seek authorization for, or permit the existence of, (i) a claim for any administrative expense that is pari passu with or senior to the super-priority DIP Claims, except for the Carve-Out, or (ii) any lien on any DIP Collateral having a priority equal or senior

27

to the liens in favor of the DIP Lender in respect of the DIP Obligations, except for the Carve-Out on the basis set forth herein.

9.    Debtors shall not (a) permit the same-store or warehouse aggregate dollar value of inventory, on a cost basis, to vary by more than ten percent (10%)  from the aggregate dollar value of inventory, on a cost basis, in such stores or warehouses as of October 31, 2020, or fail to maintain an adequate level and mix of inventory for the ordinary course conduct of the Debtors' business at each of the Debtors' business locations; (b) fail to notify the DIP Lender of any anticipated purchase of inventory at least one (1) business day prior to the date on which the Debtors place an order for the purchase of such inventory and obtain the DIP Lender's prior written approval of such anticipated purchase, it being the expectation that the Debtors will advise the DIP Lender on a weekly basis of the Debtors' intended inventory purchases for the ensuring week; or (c) place any order for a purchase of inventory or other goods for which funds are not allocated in a Budget approved by the DIP Lender for the payment when due of the same.

10.  Other than (a) the Carve-Out or (b) as otherwise provided in (i) the Interim Order or (ii) in this Term Sheet, no claim or lien having a priority superior or pari passu with those granted by the Interim Order or this Term Sheet to the DIP Lender and Pre-Petition Lender shall be granted at the request of the Debtors.  Without limiting the generality of the foregoing, the Debtors stipulate, acknowledge, and agree they will not grant any such mortgages, security interests, or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, while (a) any portion of the DIP Facility, any DIP Loans, or any other DIP Obligations are outstanding or (b) the DIP Lender has any commitment under the DIP Loan Documents.

| | |
|---|---|
| **Financial Reporting Requirements:** | The Debtors shall provide to the DIP Lender with the financial statements, reports, certificates, and all other items and information required by the Pre-Petition Credit Agreement as and when required to be delivered to the Pre-Petition Lender thereunder. |

Following delivery of the Budget, and each week thereafter during the Chapter 11 Cases, Debtors shall deliver to the DIP Lender an updated 13-week cash flow forecast, in each case, in form and substance satisfactory to the DIP Lender (the "**Weekly Cash Flow Forecast**") for the subsequent 13-week period consistent with the form of the Budget.

Beginning on the second Monday following the Closing Date, and on each Monday following, deliver an Approved Budget Variance

Report.

The Debtors will promptly provide notice to the DIP Lender of any Material Adverse Change (as defined below).

**Bankruptcy Court Filings:**

At least twenty-four (24) hours in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender all of the following:

    a.  the motion seeking approval of and proposed forms of the Interim Order and the Final Order, all of which shall be in form and substance satisfactory to the DIP Lender in its sole discretion;

    b.  the Sale Order, and the proposed forms of the orders related thereto, all of which shall be in form and substance satisfactory to the DIP Lender in its sole discretion;

    c.  all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance satisfactory to the DIP Lender in its sole discretion;

    d.  any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

    e.  any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code;

    f.  any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the DIP Lender).

**Sale Process:**

The Debtors shall conduct a sale of substantially all of the assets of the Debtors in accordance with the Milestones set forth below.

<u>Milestones</u>.   The Debtors shall be required to comply with the following (the **"Milestones"**):

- the Bankruptcy Court must have entered the Sale Procedures Order by no later than November 25, 2020;

- any competing bids must be received by Seller on or before December 14, 2020 (the "**Competing Bid Deadline**");

29

- if Seller receives one or more qualifying bids by the Competing Bid Deadline, Seller will conduct an auction on December 15, 2020;

- a hearing before the Bankruptcy Court to approve the sale must be held on or before December 17, 2020;

- the Bankruptcy Court must enter the Sale Order (defined below) on or before December 18, 2020; and

- the Closing Date must occur on or before December 30, 2020.

The Debtors shall provide or cause to be provided to the DIP Lender a written report from the management team of the Debtors weekly (or more frequently as reasonably requested by the DIP Lender) in form and substance satisfactory to, and addressing such items as are reasonably requested by the DIP Lender, including addressing the status of the marketing and sale process of the Debtors. The Debtors shall also cause its management team to be made available to provide periodic telephonic updates of such reports to the DIP Lender from time to time (but not less frequently than weekly), as reasonably requested by the DIP Lender.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

| | |
|---|---|
| **Additional Conditions to Each Borrowing Under the Facility:** | There shall exist no default (or event that would constitute a default with the giving of notice or lapse of time) hereunder or under the DIP Facility Documents, and the representations and warranties herein and in the DIP Facility Documents shall be true and correct in all material respects. |

There shall have occurred no material adverse change in the Debtors' (financial, environmental, or otherwise) operations, performance, or properties (other than, in each case, the commencement and continuation of the Chapter 11 Cases), since the date of this Term Sheet, that in the reasonable judgment of the DIP Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the DIP Lender or on the ability of the Debtors to perform their obligations to the DIP Lender under the DIP Facility.

The DIP Lender shall be reasonably satisfied that the Debtors are continuing to take action and demonstrating progress toward timely achieving each of the Milestones.

The Borrowers shall have completed and delivered to the DIP Lender a borrowing request within the timeframes and pursuant to documentation described in the section titled "**Draw Schedule**".

| | |
|---|---|
| **Remedies:** | Following the Termination Date and provided that the Bankruptcy Court does not enter any order to the contrary within the notice periods provided herein and in the Interim Order and the Final Order, as applicable, the DIP Lender shall have customary remedies, including, without limitation, the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law or equity, without the necessity of obtaining any further relief or order from the Bankruptcy Court.  Consistent with the foregoing sentence, section 362 relief from the stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility and the use of cash collateral. |
| **Additional Conditions To Financing:** | Compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order, together with any other order requested by the DIP Lender authorizing and approving the DIP Facility in form, substance and amount and providing for the DIP Collateral, all acceptable to the DIP Lender in its sole discretion. |

Payment of all fees and expenses owing to the DIP Lender in connection with the DIP Facility.

The Interim Order and Final Order shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Lender in its sole discretion.

| | |
|---|---|
| **Events of Default:** | "**Defaults**" and "**Events of Default**" shall mean the occurrence of any of the following: |

- The Chapter 11 Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed.

- Filing or support of a proposed plan of reorganization or liquidation by the Debtors that does not provide for the indefeasible payment in full of the Debtors' DIP Obligations outstanding, unless otherwise agreed in writing by the DIP Lender in its sole discretion.

31

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require the indefeasible repayment in full of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Lender in its sole discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Lender, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, without the prior written consent of the DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by the Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Lender's claims, or to subject any of the DIP Lender's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- The Debtors shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

- Failure to comply with the Milestones.

- A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.

- Failure to make any payment under the DIP Facility when due.

110906611
PHIL1 9198608v.2

- The Debtors file a pleading seeking to modify or otherwise alter any of the Interim Order or Final Order without the prior written consent of the DIP Lender.

- Failure to pay any post-petition material indebtedness when due.

- Breach of any covenant set forth in the DIP Facility Documents (including, without limitation and for the avoidance of doubt, this Term Sheet).

- Any material representation or warranty by the Debtors is incorrect or misleading when made.

- Exclusivity shall have been terminated or the Debtors shall have agreed to any such termination.

- After entry thereof, the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the prior written consent of the DIP Lender.

- Debtors shall take (or support any other Person in taking) any action in order to restrict or prohibit the DIP Lender or Pre-Petition Lender from submitting a "credit bid" for any assets of the Debtors.

- Any provision in any guaranty or any of the collateral documents shall for any reason cease to be valid and binding on, or enforceable against, any of the Debtors, or any of the Debtors shall so state in writing, or any of the Debtors shall seek to terminate its obligation under the such guaranty or such collateral document.

- Any Lien purported to be created under any of the collateral documents shall fail or cease to be, or shall be asserted by any of the Debtors or any other person not to be, a valid and perfected Lien on any collateral, with the priority required by the applicable collateral documents.

- Any sale of all or substantially all assets pursuant to Section 363 of the Bankruptcy Code (other than a sale to DIP Lender), unless (i) the proceeds of such sale are used to pay the DIP Facility and Pre-Petition Obligations in full in cash on a final and indefeasible basis with all commitments

33

terminated, or (ii) such sale in consented to by the DIP Lender.

- The Debtors fail to disburse the proceeds of any 363 Sale to the DIP Lender in accordance with the terms hereof.

- Entry of an order granting any super-priority claim (except as contemplated herein) which is senior to or *pari passu* with the claims of the DIP Lender the under the DIP Facility or the Pre-Petition Lender under the Pre-Petition Credit Agreement;

- Payment of or granting adequate protection with respect to pre-petition debt other than as approved by the DIP Lender or otherwise contemplated hereby.

- Any challenge to the validity of the liens in favor of or claims held by the Pre-Petition Lender or DIP Lender (excluding challenges by parties other than a Debtor that are not inconsistent with the terms and conditions of the then applicable Financing Order).

- Any of the Debtors uses cash collateral or proceeds of the DIP Facility for any item other than those set forth in, and in accordance with, the Budget, except with the prior consent of the DIP Lender.

- Permitted Budget Variances under the Budget are exceeded for any period of time.

- An order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.

- (a) Termination of the exclusive period for the Debtors to file a plan of reorganization in the Chapter 11 Cases, (b) the filing of a plan of reorganization without the prior consent of the DIP Lender, or (c) entry of any order in the Chapter 11 Cases confirming a plan of reorganization that does not require the DIP Obligations and Pre-Petition Obligations to be paid in full.

- The occurrence of any Material Adverse Change.

- Noncompliance with any other covenants in this Term Sheet or any of the DIP Loan Documents.

- The occurrence and continuance of any "Event of Default" under and as defined in the Pre-Petition Credit Agreement (other than solely as a result of the Chapter 11 Cases).

- Any violation by the Debtors of the terms of the Financing Orders.

The Debtors fail to disburse the sale proceeds to the DIP Lender contemporaneously with the closing of a sale of substantially all of their assets, subject to payment of the Carve-Out.

Upon the occurrence and continuance of any Event of Default, the DIP Lender shall have all rights and remedies available under the DIP Loan Documents, all other agreements, the Financing Orders, and under the Bankruptcy Code, other applicable law and in equity, including without limitation the rights and remedies of a secured creditor under the Uniform Commercial Code. The rights and remedies of the DIP Lender under the DIP Loan Documents, all other agreements, the Financing Orders, and applicable law shall be cumulative. No exercise by the DIP Lender of one right or remedy shall be deemed an election, and no wavier by the DIP Lender of any Event of Default shall be deemed a continuing waiver. No delay by the DIP Lender shall constitute a waiver, election, or acquiescence by it.

**Termination:**    Notwithstanding section 362 of the Bankruptcy Code, upon the occurrence and during the continuance of an event of default under the DIP Loan Documents, the DIP Lender may, by written notice (which such notice may be given by electronic mail) (a "***Termination Notice***") to the Borrowers, their counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents and the Financing Orders.

The automatic stay imposed by section 362 of the Bankruptcy Code otherwise applicable to the DIP Lender shall be modified so that five (5) business days after the date a Termination Notice is delivered (the "***Remedies Notice Period***") the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and the Orders to satisfy the DIP Obligations and the DIP Liens; provided that upon the repayment in full of the DIP Obligations, the Pre-Petition Lender shall be entitled to exercise its rights and remedies in accordance with the Pre-Petition Credit Agreement and the Financing Orders to satisfy the Pre-Petition Obligations, the Pre-Petition Lender Adequate Protection Liens.

35

Upon the earlier to occur of (i) the expiration of the Remedies Notice Period, and (ii) the Maturity Date, the DIP Lender and the Pre-Petition Lender shall be permitted to exercise all remedies set forth in the DIP Loan Documents, the Pre-Petition Credit Agreement, and the Financing Orders, as applicable, and as otherwise available at law without further order of, or application or motion to, the Bankruptcy Court.

**Indemnification:** The Debtors shall indemnify and hold harmless the DIP Lender, and reimburse all expenses of the DIP Lender, all in accordance with the terms and conditions of the Pre-Petition Credit Agreement and the Loan Documents.

**Releases:** Upon execution of this Term Sheet, each Debtor, on behalf of itself and its agents, representatives, officers, members, managers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (collectively, the "***Releasors***"), hereby forever agrees and covenants not to sue or prosecute against the DIP Lender, the Pre-Petition Agent or the Pre-Petition Lender in any capacity and its affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys, advisors and other representatives of each of the foregoing (collectively, the "***Releasees***") and hereby forever, waives, releases and discharges, to the fullest extent permitted by law, each Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, right of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such Releasor now has or hereafter may have, of whatsoever nature and kind, of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, including, but not limited to, any and all claims which may be based on allegations of breach of contract, failure to lend, fraud, promissory estoppel, libel, slander, usury, negligence, misrepresentation, breach of fiduciary duty, bad faith, lender malpractice, undue influence, duress, tortious interference with contractual relations, interference with management, or misuse of control which any Releasor now has or hereafter can, shall or may have by reason of any matter, cause, thing or event occurring on or prior the date of this Term Sheet (collectively, the "***Claims***"), against any Releasee, based in whole or in part on facts, whether or not now known that relate to, arise out of or otherwise are in connection with: (i) any or all of the DIP Loan Documents, the DIP Obligations or the

transactions contemplated thereby or any actions or omissions in connection therewith, or (ii) any aspects of the dealings or relationships between or among the Debtors (or any of them), on the one hand, and DIP Lender, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof. With respect to any Debtor, the receipt by any Debtor of any Advance or any other DIP Loan or financial accommodation made by DIP Lender after the date hereof shall constitute a ratification, adoption, and confirmation by such party of the foregoing general release of all Claims against the Releases that are based in whole or in part on facts, whether or not now known or unknown, existing on or prior to the date of receipt of any such Advances, DIP Loans or other financial accommodations. In entering into this Term Sheet, each Debtor consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity thereof. The provisions of this Section shall survive the termination or expiration of this Term Sheet and the other DIP Loan Documents and payment in full of the DIP Obligations.

**Governing Law:** All documentation in connection with the DIP Facility shall be governed by the laws of the state of Delaware, subject to applicable federal bankruptcy laws.

**Jurisdiction:** Loan documentation shall include the Debtors' consent to the nonexclusive jurisdiction and venue of the state or federal courts located in the Bankruptcy Court.

**Carve-Out:** The liens and claims granted to the DIP Lender and Pre-Petition Lender in the Interim Order, the Final Order, this Term Sheet, and/or the Pre-Petition Credit Agreement and related documents are all subject to the Carve-Out.

**Assignments & Participations:** Same terms and conditions as those in the Pre-Petition Credit Agreement.

**Miscellaneous:** The definitive loan documentation shall also include customary provisions regarding confidentiality of information, no waivers or amendments thereto without the DIP Lender's consent, and such other matters as are customary in the reasonable discretion of the DIP Lender and are incorporated from the Pre-Petition Credit Agreement by reference.

## Additional Defined Terms

**Other Definitions:**   **"Approved Budget Variance Report"** means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.  Each Approved Budget Variance Report will be certified as true and correct by the FFO's chief financial officer or chief executive officer.

**"Asset Purchase Agreement"** means an agreement between the Debtors and American Freight that provides for the purchase and sale of substantially all of the assets of the Debtors.

**"Auction"** means an auction held in connection with the Sale and in accordance with the provisions set forth in the Sale Order.

**"Bankruptcy Code"** means Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq*.), as amended.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Cases.

**"Budget"** means the budget of the Debtors, attached hereto as Exhibit A and incorporated herein by reference, which reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the eighth calendar week following the Petition Date, as well as any accruals of obligations incurred during such period that may become due after such period, as delivered to the DIP Lender in form and substance satisfactory to the DIP Lender. A Budget for the three weeks of the Chapter 11 Cases (the "**Interim Budget**") must be approved by the DIP Lender and must be attached to the Interim Order.  A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Debtors to the DIP Lender (and approved by the DIP Lender in its sole discretion) at least two (2) business days before any hearing related to final approval of the DIP Facility and must be attached to the Final Order.  References herein to a "Budget" shall be deemed to include references to the "Interim Budget."

**"Carve-Out"** means:

(a)        unpaid, postpetition fees and expenses of the Clerk of the

38

Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee as agreed to by the U.S. Trustee or as determined by the Court plus interest pursuant to 31 U.S.C. § 3717 (collectively, the "**Statutory Fees**");

(b)      the unpaid postpetition fees and expenses of the professionals retained by the Debtors and by any Committee, whose retentions are approved pursuant to orders of the Court under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred prior to the giving of a notice of the occurrence of the Termination Date by the DIP Lender to the Debtors and any Committee, (ii) within the amounts set forth in the Budget approved by the DIP Lender, (iii) subsequently allowed by the Bankruptcy Court under sections 327, 328, 330, 331, or 363 of the Bankruptcy Code, and (iv) not otherwise paid from retainers;

(c)      postpetition fees and expenses of the Chapter 11 Professionals incurred after the DIP Lender's transmission of notice of the Termination Date in an aggregate amount not to exceed $100,000, to the extent such fees and expenses are (i) subsequently allowed by the Bankruptcy Court under sections 327, 328, 330, 331, or 363 of the Bankruptcy Code, and (ii) not otherwise paid from any retainers; <u>provided</u> that such notice of Termination Date is not rescinded or withdrawn; and

(d) the full amount of all administrative expense claims allowed pursuant to final order of the Bankruptcy Court pursuant to Sections 503, 506, or 507 of the Bankruptcy Code, to the extent such claims are permitted by the Budget.

"**Chapter 11 Cases**" means the voluntary Chapter 11 cases to be commenced by the Debtors in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed by the United States Trustee in the Chapter 11 Cases.

"**Contractual Obligations**" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**DIP Facility Documents**" means collectively this Term Sheet and all documents by and among any of the Debtors, and the DIP Lender relating to the DIP Facility.

"**Final Order**" means a final, non-appealable order of the

39

Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Lender in its sole discretion.

"**Financing Orders**" means the Interim Order together with the Final Order.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtors, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to the DIP Lender in its sole discretion.

"**Material Adverse Change**" means any: (a) material adverse change in the business, assets, operations or financial condition of any Debtor (other than solely as a result of the Chapter 11 Cases); or (b) material adverse change in the ability of any Debtor to pay or perform the DIP Obligations in accordance with their terms; or (c) material adverse change in the value, collectability or salability of the DIP Collateral; or (d) the occurrence of any event, development, circumstance or condition, or series of events, developments, circumstances or conditions, that could have a material adverse effect on the validity or enforceability of this Term Sheet or any of the other DIP Loan Documents, or on the perfection or priority of the DIP Lender's security interests in any DIP Collateral (other than as the direct result of action or inaction of the DIP Lender); or (e) the occurrence of any event, development, circumstance or condition, or series of events, developments, circumstances or conditions that materially impairs any Debtor's ability to perform under this Term Sheet or under any of the other DIP Loan Documents.  The determination of whether a Material Adverse Change has occurred shall be made by the DIP Lender in its sole discretion.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"**Petition Date**" means the date on which the Chapter 11 Cases for

such Debtors were filed with the Bankruptcy Court.

"**Prior Liens**" means only valid, enforceable, and non-avoidable liens and security interests in the 1L Pre-Petition Collateral (as defined in the Interim Order) that were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the 1L Pre-Petition Liens (as defined in the Interim Order) under applicable law and after giving effect to any subordination or intercreditor agreements.

"**Prohibited Assignee**" means any official committee appointed in these cases, any chapter 7 or 11 trustee appointed in these cases or any other person or entity who purports to be acting on behalf of the Debtors' estates (including without limitation any plan administrator or plan trustee), one or more creditors of the Debtors or any such committee or trustee, or any other Person who does not purchase all of American Freight's interest in the loans under the Pre-Petition Credit Agreement as they exist on the date hereof (including any interest in which it is converted into after the date hereof, whether by credit bid or otherwise).

"**Sale Order**" means the order entered by the Bankruptcy Court in form and substance satisfactory to the DIP Lender that, among other things, approves the Sale, and either (a) the transaction set forth in the Asset Purchase Agreement or (b) the results of any Auction, if applicable.

"**Sale Procedures Order**" means an order in form and substance satisfactory to the DIP Lender in its sole discretion approving (a) the bidding procedures to be applicable to the  Sale and (b) any break-up fee and expense reimbursement provided for the stalking horse purchaser in the Asset Purchase Agreement.

"**Sale Transaction**" means a sale of all or substantially all of the Debtors' assets.

"*Third-Party Asset Purchase Agreement*" means an asset purchase agreement by and among the Debtors and a third-party purchaser that provides for a 363 Sale, which third party purchaser and asset purchase agreement are satisfactory to the DIP Lender.

This Term Sheet shall be governed by, and construed and interpreted in accordance with, the law of the State of Delaware, and the Debtors consent to the nonexclusive jurisdiction and venue of the Bankruptcy Court. Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any right it may have to a trial by jury in any suit, action, claim, counterclaim or other proceeding arising out of or relating to this letter agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory) or the performance of services hereunder and (b) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the Bankruptcy Court.

This Term Sheet embodies the entire agreement among the parties hereto and supersedes all prior commitments, agreements, representations, and understandings, whether oral or written, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. All Exhibits, Schedules and Annexes referred to herein are incorporated in this Term Sheet by reference and constitute a part of this Term Sheet. This Term Sheet and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one in the same instrument. This Term Sheet shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

Accepted and agreed to this ___5th__ day of _November_____, 2020.

AMERICAN FREIGHT FFO, LLC, as the DIP Lender

By:   /s/ William A. Powell
Name:  William A. Powell
Title:   President and CEO

FURNITURE FACTORY OUTLET, LLC, as a Borrower

By: _____
Name:
Title:

BEDDING, LLC, as a Borrower

By: _____
Name:
Title:

FURNITURE FACTORY ULTIMATE HOLDING, LP, as a Guarantor

By: _____
Name:

purchaser in the Asset Purchase Agreement.

**"Sale Transaction"** means a sale of all or substantially all of the Debtors' assets.

"***Third-Party Asset Purchase Agreement***" means an asset purchase agreement by and among the Debtors and a third-party purchaser that provides for a 363 Sale, which third party purchaser and asset purchase agreement are satisfactory to the DIP Lender.

      This Term Sheet shall be governed by, and construed and interpreted in accordance with, the law of the State of Delaware.  The Debtors consents to the nonexclusive jurisdiction and venue of the state or federal courts located in the State of Delaware, including the U.S. Bankruptcy Court for the District of Delaware.  Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any right it may have to a trial by jury in any suit, action, claim, counterclaim or other proceeding arising out of or relating to this letter agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory) or the performance of services hereunder and (b) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the state or federal courts located in State of Delaware, including the U.S. Bankruptcy Court for the District of Delaware.

      This Term Sheet embodies the entire agreement among the parties hereto and supersedes all prior commitments, agreements, representations, and understandings, whether oral or written, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. All Exhibits, Schedules and Annexes referred to herein are incorporated in this Term Sheet by reference and constitute a part of this Term Sheet.  This Term Sheet and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one in the same instrument.  This Term Sheet shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

Accepted and agreed to this _____ day of _____, 2020.


AMERICAN FREIGHT FFO, LLC, as the DIP Lender

FURNITURE FACTORY OUTLET, LLC, as a Borrower


By: _____
Name:
Title:

By: _____
Name:
Title:

BEDDING, LLC, as a Borrower

By: _____
Name:
Title:

FURNITURE FACTORY ULTIMATE
HOLDING, LP, as a [limited Guarantor]

By: _____
Name:
Title:

FURNITURE FACTORY HOLDING, LLC,
as a Guarantor

By: _____
Name:
Title:

FURNITURE FACTORY INTERMEDIATE
HOLDING, LLC, as a Guarantor

By: _____
Name:
Title:

FURNITURE FACTORY OUTLET
TRANSPORTATION, INC., as a Guarantor

By: _____
Name:
Title:

BEDDING HOLDING, LLC, as a Guarantor

By: _____
Name:
Title:

BEDDING INTERMEDIATE HOLDING,
LLC, as a Guarantor

By: _____
Name:
Title:

## EXHIBIT A

**Budget**

[to be attached]

110906611
PHIL1 9198608v.2

| Week | | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | Current |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Post-Petition Period - Operating | | | | | | Post-Closing Period - No Operations | | | | Total Nov 7 - Jan 30 |
| | | P11 | P11 | P11 | P12 | P12 | P12 | P12 | P12 | P1 | P1 | P1 | P1 | P2 | |
| | | 7-Nov | 14-Nov | 21-Nov | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec | 2-Jan | 9-Jan | 16-Jan | 23-Jan | 30-Jan | |
| | | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 1 | 2 | 3 | 4 | 5 | |
| **Cash Inflow** | | 1,058 | 1,032 | 1,135 | 1,953 | 1,317 | 1,394 | 1,355 | 1,292 | 1,253 | | | | | 11,290 |
| | | | | | | | | | | | | | | | |
| COGS | | 361 | 889 | 963 | 687 | 871 | 677 | 683 | 881 | | | | | | 6,682 |
| Critical Vendor Payments | | 12 | 22 | 73 | 91 | 56 | 42 | 43 | 52 | | | | | | 392 |
| Protection plan | | | | 36 | | | | | 58 | | | | | | 94 |
| Rent | | 316 | | | | 516 | | | | | | | | | 832 |
| Lease terminations | | | | - | - | - | - | | - | - | | | | | |
| | | | | | | | | | | | | | | | |
| **Payroll & Benefits** | | | | | | | | | | | | | | | |
| **Stores - Paid 1 Week in Arrears:** | | | | | | | | | | | | | | | |
| Managers | | 136 | - | 54 | - | 129 | - | 54 | - | 129 | - | 65 | - | 105 | 672 |
| ASM/Sales | | 239 | - | 240 | - | 279 | - | 227 | - | 232 | - | 116 | - | 19 | 1,431 |
| Hourly Support | | 41 | - | 41 | - | 35 | - | 41 | - | 35 | - | 18 | - | 6 | 217 |
| PR Taxes | | 10 | - | 10 | - | 10 | - | - | - | 10 | - | 5 | - | - | 55 |
| **Total store wages & taxes** | | 426 | - | 345 | - | 453 | - | 332 | - | 406 | - | 203 | - | 130 | 2,295 |
| | | | | | | | | | | | | | | | |
| SSC incl DM's & FFOT | | 158 | - | 115 | - | 115 | - | 115 | - | 114 | - | 57 | - | 44 | 718 |
| Comfort Coil | | 17 | - | 17 | - | 17 | - | 17 | - | 17 | - | 9 | - | - | 14 |
| Executive Team | | 42 | - | 42 | - | 42 | - | 42 | - | 42 | - | 21 | - | - | |
| Severance | | | | | | | | | | | | | | | |
| Bonus - Others | | | | | | | | | | | | | | | |
| Consulting (GMM, Mktg Mgr, VP Finance) | | 15 | 15 | 15 | 15 | 10 | 10 | 10 | 10 | 11 | | | | | 105 |
| PR Taxes | | 10 | - | 10 | - | 10 | 10 | 10 | 10 | 10 | - | 5 | - | - | 55 |
| **Total wages & taxes - SSC, DM's, FFOT, Exec Team** | | 242 | 15 | 198 | 15 | 194 | 10 | 194 | 10 | 194 | - | 92 | - | 44 | 1,215 |
| | | | | | | | | | | | | | | | |
| Benefits | | | | 140 | | | | | 140 | | | | | | 45 |
| Website Development | | | | 10 | | | | | 10 | | | | | | |
| Advertising (Local IQ) | | | | | | | | | | | | | 25 | | |
| Store Security | | 3 | 1 | - | - | 3 | 1 | - | - | - | 3 | 1 | - | - | 41 |
| Marketing | | - | | | | | | | | | | | | | - |
| IT | | | 14 | | | | 14 | 63 | 63 | | | | 14 | | 105 |
| Website Design | | | | | | | | | | - | | | | - | - |
| Audit & Tax | | | | | | | 50 | | | | | | | | 50 |
| Store Utilities / Office Utilities / Telephone / Cable | | 68 | 19 | 8 | 13 | 68 | 19 | 8 | 13 | 68 | 19 | 8 | 13 | 68 | 391 |

| Line Item | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Property Taxes | | 40 | | 25 | | | | 240 | | | | | | 305 |
| Business Insurance | | | | | | | | 48 | 50 | | | | | 145 |
| Customer refunds | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | | | | | 63 |
| Supplies | | | | | | | | | | | | | | - |
| Bank fees | | | | | | | | | | | | | | 10 |
| Comfort Coil Equipment Lease & Note | 4 | 4 | 1 | 1 | | | 1 | | | | | | | 10 |
| Maintenance and Repairs | | | | | | | | | | | | | | |
| Legal | | | | | | | | | | | | | | |
| Real Estate Advisory | | | | | | | | | | | | | | |
| Delivery | 42 | 41 | 45 | 78 | 53 | 56 | 54 | 52 | 50 | 30 | 30 | 30 | 30 | |
| Repair Techs | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | |
| Miscellaneous A/P Payments | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 10 | 10 | 10 | 10 | |
| **Weekly Burn Rate** | **1,521** | **1,092** | **1,874** | **1,010** | **2,264** | **919** | **1,370** | **1,618** | **770** | **68** | **351** | **99** | **337** | **1,938** |
| | | | | | | | | | | | | | | |
| Pcard/Epay/Fuel Cards | | 80 | | 20 | | 27 | | 80 | | | | | | |
| Income tax | 11 | | | | | | | | | | | | | |
| Sales Tax | 25 | 65 | 246 | 25 | 65 | 65 | 389 | 65 | 25 | | | | | |
| Retention/Incentive Bonuses | | | | | | | | | | 419 | 100 | | | |
| Miscellaneous A/P Payments | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | | | |
| Term Loan Payment | | | | | | | | | 10 | | | | | |
| Investment Banker Advisory | 35 | | 35 | | 35 | | 35 | | | | 430 | | | |
| Legal - Real Estate | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | | | | | |
| Legal - Restructuring | 25 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | | | | | |
| Financial Advisory - Restructuring | | | | | | | | | 83 | | | | | 300 |
| US Trustee Fees | | | | | | | | | 34 | | | | | |
| Claims & Noticing Agent | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | | | 260 | | |
| Lender Professionals | | 200 | | | 235 | | | 165 | | | | | | |
| Committee Professionals | | | | | | | | | | | 200 | | | |
| DIP Interest (7.2%) and Commitment Fee (1%) | 52 | | | 10 | | | | 21 | | | | | 31 | |
| Wind Down Costs | | | | | | | | | 739 | | | | | |
| **Total** | **1,756** | **1,313** | **2,556** | **1,267** | **2,476** | **1,402** | **1,955** | **1,876** | | | | | | **18,130** |
| | | | | | | | | | | | | | | |
| **Net Change in Cash** | **(699)** | **(282)** | **(1,420)** | **686** | **(1,159)** | **(9)** | **(560)** | **(663)** | **(623)** | **(78)** | **(361)** | **(1,518)** | **(378)** | **(7,962)** |
| Book Cash Balance Beginning of Week | 570 | (128) | (410) | (1,831) | (1,144) | (2,303) | (2,312) | (2,872) | (3,535) | (4,158) | (4,236) | (4,596) | (6,114) | |
| Excess Cash Sweep | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Week Ending Book Cash Balance** | **(128)** | **(410)** | **(1,831)** | **(1,144)** | **(2,303)** | **(2,312)** | **(2,872)** | **(3,535)** | **(4,158)** | **(4,236)** | **(4,596)** | **(6,114)** | **(6,492)** | |
| | | | | | | | | | | | | | | |
| Cash Balance | 530 | 2,331 | 2,049 | 629 | 2,165 | 1,007 | 2,598 | 2,038 | 1,375 | 2,342 | 2,264 | 1,903 | 386 | 530 |
| Weekly Cash Use | (699) | (282) | (1,420) | 686 | (1,159) | (9) | (560) | (663) | (623) | (78) | (361) | (1,518) | (378) | (7,062) |
| DIP Borrowing per Agreement | 2,500 | | | 850 | | 1,600 | | | 1,590 | | | | | 6,540 |
| Cash Balance incl Borrowing | 2,331 | 2,049 | 629 | 2,165 | 1,007 | 2,598 | 2,038 | 1,375 | 2,342 | 2,264 | 1,903 | 386 | 8 | 8 |